UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD MATTOX (#186106),

                              CASE NO. 1:12-CV-13762
           Plaintiff,               JUDGE LAURIE J. MICHELSON
                              MAGISTRATE JUDGE PAUL J. KOMIVES

v.

ADAM D. EDELMAN and
ADRIANNE M. NEFF,

                    Defendants,

_____/

**REPORT AND RECOMMENDATION REGARDING DEFENDANT EDELMAN'S
OCTOBER 31, 2013 MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 44)**

**Table of Contents**

I.      RECOMMENDATION: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.     Mattox filed this case on August 24, 2012 against Edelman and Neff. . . . . . . . . . . . . . . . . . . . . 2
     B.     Currently, the only remaining defendant is Edelman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.     Edelman has filed a motion for summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     D.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          1.     Plaintiff's August 24, 2012 claims against Edelman concern his denials of Prabhu's July
                2011 request, Byler's August 2011 request and Rhodes's September 2011 request. . . . 5
          2.     Defendant Edelman's October 31, 2013 motion argues that "Edelman did not act with
                deliberate indifference to Plaintiff's serious medical needs when he deferred the
                cardiologists' requests for a cardiac catheterization." . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          3.     Plaintiff's responses emphasize that his claim against Edelman is based not just on the
                denials of requests for a cardiac catheterization, but also on the September 2011 deferral
                of Rhodes's request for a cardiology referral "to change meds, treatment for unstable
                angina." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
          4.     Defendant Edelman's replies address his September 15, 2011 decision; maintain that he is
                not vicariously liable for Pandya's October 12, 2011 decision; explain the disagreement
                with Glick's April 2012 opinion; and comment on Borgerding's December 2013 decision.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          5.     Plaintiff's August 24, 2012 claims against Edelman do not survive summary judgment.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.    NOTICE TO PARTIES REGARDING OBJECTIONS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

I.      **RECOMMENDATION:** The Court should grant defendant Edelman's October 31, 2013

motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Doc. Ent. 44.

II.     **REPORT:**

A.      **Mattox filed this case[1] on August 24, 2012 against Edelman and Neff.**

Todd Mattox (#186106) is currently incarcerated at the Michigan Department of

Corrections (MDOC) West Shoreline Correctional Facility (MTF) in Muskegon Heights,

Michigan.  *See* Doc. Entries 59 and 60.  On August 24, 2012, while incarcerated at Lakeland

Correctional Facility (LCF), Mattox filed the instant fee-paid case against Adam D. Edelman,

described as a doctor employed by Prison Health Services (PHS)/Corizon, and Adrianne M.

Neff, described as a G. Robert Cotton Correctional Facility (JCF) Physician Assistant.  Doc. Ent.

1 at 1, Doc. Ent. 1 at 5-6 ¶¶ 2-3.[2]

Plaintiff's factual allegations span the period from July 25, 2011, when he experienced,

among other things, chest pain, through April 24, 2012, when a cardiac catheterization was

performed.  Doc. Ent. 1 ¶¶ 8-99.  It appears that his sole cause of action is based upon the Eighth

Amendment.  Doc. Ent. 1 ¶¶ 100-104.  Plaintiff seeks declaratory relief, compensatory damages

and punitive damages.  Doc. Ent. 1 at 16-17 ¶ 105.

Appearances of counsel have been filed on behalf of each defendant.  Doc. Entries 8, 9,

22 & 25.  On June 12, 2013, defendant Edelman filed a waiver of answer.  *See* Doc. Ent. 24.

---

[1]Previously, Todd Mattox (#186106) filed prisoner civil rights case *Mattox v. Caruso, et al.*, Case No. 2:08-cv-13020-BAF-VMM (E.D. Mich.), and prison conditions case *Mattox v. Trombley*, Case No. 2:10-cv-10721-GER-MAR (E.D. Mich.).

[2]Although this case was originally assigned to Judge Thomas L. Ludington, it has since been reassigned to Judge Laurie J. Michelson.  Doc. Ent. 61 (May 6, 2014 Notice of Reassignment).

**B.      Currently, the only remaining defendant is Edelman.**

On October 5, 2012, defendant Neff filed a motion to dismiss.  Doc. Ent. 7.  On June 24,

2013, I entered a report (Doc. Ent. 27) recommending that the Court grant defendant Neff's

motion to dismiss (Doc. Ent. 7).

On July 30, 2013, Judge Ludington entered an opinion and order (Doc. Ent. 32)

overruling objections (Doc. Entries 30 & 31), adopting my report and recommendation (Doc.

Ent. 27), and granting defendant Neff's motion to dismiss (Doc. Ent. 7).  Among other things,

Judge Ludington stated:

> To summarize, Plaintiff is complaining that Ms. Neff violated the Eight[h]
> Amendment by declining to send Plaintiff to the hospital for a test that would
> reveal that he did not have a serious medical condition. The Eighth Amendment
> prohibits deliberate indifference. It does not prohibit declining to order
> unnecessary tests. Ms. Neff's motion to dismiss will be granted.

Doc. Ent. 32 at 6.  As a result, Neff was terminated as a defendant.

On August 15, 2013, plaintiff requested a rehearing (Doc. Ent. 33); however, Judge

Ludington denied this request on October 4, 2013 (Doc. Ent. 42).  Among other things, the Court

observed, "Plaintiff has not alleged any new facts that plausibly suggest that he had a serious

medical need on the night of August 14 that Defendant Neff was deliberately indifferent to."

Doc. Ent. 42 at 2.[3]

**C.      Edelman has filed a motion for summary judgment.**

On October 31, 2013, defendant Edelman filed a motion for summary judgment (Doc.

Ent. 44), attached to which is his certification (Doc. Ent. 44-2), as well as a 442-page sealed

---

[3]Plaintiff's pending motions to amend (Doc. Entries 34 [8/30/2013] and 37 [9/13/2013]) will
be addressed under separate cover.

exhibit of select portions of plaintiff's medical record (Doc. Ent. 46; *see also* Doc. Ent. 44-3).[4]
In his dispositive motion, Edelman mentions the original, August 24, 2012 complaint (Doc. Ent.
44 ¶ 1), sets forth a lengthy statement of facts (Doc. Ent. 44 at 7-28) and argues that he
(Edelman) "was not deliberately indifferent to the plaintiff's serious medical needs when he
declined to approve the cardiac catheterizations[,]" Doc. Ent. 44 at 30-33.

Pursuant to the Court's November 4, 2013 notice (Doc. Ent. 49), any response by
plaintiff was due by December 31, 2013 and any reply was due January 13, 2014. Pursuant to
the Court's November 15, 2013 order (Doc. Ent. 51), which granted in part and denied in part
plaintiff's motion for enlargement of time in which to respond (Doc. Ent. 50), the response
deadline was extended to January 31, 2014 and the reply deadline was extended to March 3,
2014.

On January 30, 2014, plaintiff filed a response. *See* Doc. Entries 52 and 53.[5] Edelman
filed a reply on February 7, 2014. Doc. Ent. 54.

Plaintiff filed a sur-reply on March 21, 2014. Doc. Ent. 55.[6] Then, Edelman filed a
response on April 2, 2014. Doc. Ent. 56. Plaintiff filed a supplement (Doc. Ent. 57) on April 3,
2014, and he filed a reply (Doc. Ent. 58) on April 14, 2014.

---

[4]On November 1, 2013, Judge Ludington entered an order (Doc. Ent. 48) granting Edelman's
October 31, 2013 motion to seal (Doc. Ent. 45).

[5]Docket Entries 52 and 53 are duplicate filings. Attached to these filings are Edelman's and
Neff's September 25, 2013 answers to plaintiff's first interrogatories and responses to plaintiff's
request for production of documents (Doc. Ent. 52/53 at 22-47), as well as 128 exhibits (Doc. Ent.
52 at 48-100, Doc. Ent. 52-1 at 1-92 and Doc. Ent. 53 at 48-99, Doc. Ent. 53-1 at 1-91).
This report will only refer to Doc. Ent. 52.

[6]Attached to this filing are forty-one (41) exhibits, dated from June 12, 2013 to March 10,
2014. *See* Doc. Ent. 55 at 7-100, Doc. Ent. 55-1 at 1-52.

**D.     Analysis**

**1.     Plaintiff's August 24, 2012 claims against Edelman concern his denials of Prabhu's July 2011 request, Byler's August 2011 request and Rhodes's September 2011 request.**

Plaintiff's August 24, 2012 original complaint (Doc. Ent. 1) makes several allegations as to Edelman.  To begin, plaintiff takes issue with Edelman's July 2011 denial of authorization for a cardiac catheterization recommended by Dr. Prabhu of Michigan Heart.  Doc. Ent. 1 ¶¶ 16-19, 24 [MDOC Grievance Identifier JCF-2011-08-01632-12d1]; *see also* Doc. Ent. 46-9 at 27-28 (July 26, 2011 Consultation by Arvind Prabhu, M.D.); Doc. Ent. 46-9 at 9-10 (July 29, 2011 Allegiance Health Discharge Summary by Mohmmed Al-Shihabi, M.D.); Doc. Ent. 46-5 at 33-34 (July 29, 2011 Allegiance Health Continuing Plan of Care Patient Transfer Form).

Also, plaintiff takes issue with Edelman's apparent August 2011 denial of authorization for a cardiac catheterization recommended by Richard Byler, M.D., of Michigan Heart.  Doc. Ent. 1 ¶¶ 38, 50 [MDOC Grievance Identifier JCF-2011-09-01974-12d1]; *see also* Doc. Ent. 46-8 at 13-16 (August 16, 2011 Allegiance Health Discharge Summary by Kim Wilson, N.P.); Doc. Ent. 46-8 at 17-19 (August 15, 2011 Allegiance Health History and Physical by Vlad Motoc, M.D.), and Doc. Ent. 46-8 at 20-22 (August 16, 2011 Allegiance Health Cardiac Consultation by Dr. Byler).

Finally, plaintiff takes issue with Edelman's September 15, 2011 denial of Karen M. Rhodes, D.O.'s referral.  Doc. Ent. 1 ¶ 55.  By way of background, Dr. Rhodes's September 9, 2011 Chronic Care Visit notes indicate that plaintiff's prescription for Imdur was stopped that day.  Doc. Ent. 38 at 33-34. On September 9 and/or 15, 2011, Dr. Rhodes sought a "cardiology referral to change meds, treatment for unstable angina."  Doc. Ent. 52 at 66-68.  The September

5

9, 2011 and September 15, 2011 MDOC Consultation notes indicate that Mattox "is unable to tolerate long acting nitrates (Imdur) due to side effect of severe dizziness[,]" while Edelman's September 15, 2011 decision notes that Mattox was "ruled out at the hospital," and "did not meet criteria for a cath[,]" with direction to "[t]reat stable angina as per guidelines."  Doc. Ent. 46-3 at 45-46, Doc. Ent. 52 at 66-68.[7]

According to plaintiff, Edelman violated the Eighth Amendment when he "refus[ed] to follow course of treatment by (3) three different cardiologists and Mattox's health care provider Dr. Karen Rhodes when the need for cardiac [catheterization] and adequate medical therapy were obvious[,]" and "deni[ed] . . . Mattox access to cardiologist capable of evaluating the need for treatment of medical conditions which may cause future heart attack or death."  Doc. Ent. 1 ¶¶ 103 & 104.

**2.     Defendant Edelman's October 31, 2013 motion argues that "Edelman did not act with deliberate indifference to Plaintiff's serious medical needs when he deferred the cardiologists' requests for a cardiac catheterization."**

In general, Edelman argues that, in his professional judgment, "Plaintiff did not exhibit objective indication that he required a catheterization[,]" and "Edelman was correct, as the cardiac catheterization was entirely normal."  Doc. Ent. 44 at 2 ¶ 3.  In sum, defendant Edelman states:

---

[7]On April 21, 2012, plaintiff was admitted to Allegiance Health and underwent a cardiac catheterization on April 24, 2012.  *See* Doc. Ent. 1 ¶¶ 92 [4/21/12] - 99 [4/24/12]; *see also* Doc. Ent. 46-7 at 17; 18-19 (April 24, 2012 Allegiance Health Discharge Summary by Vlad Motoc, M.D.); 20-23 (April 21, 2012 Allegiance Health History and Physical by Ronda Albrecht, M.S.N., A.C.N.P.-B.C.); 24-25 (April 22, 2012 Allegiance Health Cardiac Consultation by Cathy Glick, M.D.); 26-27 (April 24, 2012 Allegiance Health Cardiovascular Procedure Report by Mark Zande, M.D.); and 28 (April 24, 2012 Allegiance Health Progress Note Postoperative Cardiac Cath/Special Procedures Note).

This case represents a classic dispute where physicians, acting in their medical judgment, disagree with the appropriate course of treatment. Based on sound medical evidence, Dr. Edelman felt that a cardiac catheterization was an unnecessary test for Plaintiff Todd Mattox's complaints of chest pain. The cardiologists, however, thought the catheterization was needed. When the catheterization was performed, it was normal. The cardiologists recommended investigation of non cardiac causes. Dr. Edelman did not act with deliberate indifference by engaging in an independent assessment regarding whether a cardiac catheterization was needed in light of the Plaintiff's symptoms, even if his ultimate conclusion contradicted the cardiologists.

Doc. Ent. 44 at 4-5.

In support of his argument that he was not deliberately indifferent to Mattox's serious medical needs when he (Edelman) declined to approve the cardiac catheterizations (Doc. Ent. 44 at 30-33), Edelman points out that "[a] difference of opinion over diagnosis or treatment does not amount to a showing of an Eighth Amendment claim of deliberate indifference to a serious medical need." *Reed v. Sapp*, No. 99-5752, 2000 WL 571994, 2 (6th Cir. May 5, 2000) (referencing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).  Doc. Ent. 44 at 30-31. Defendant Edelman also relies upon *Longwish v. Alexis*, No. 1:12 CV 53, 2012 WL 7682812 (W.D. Mich. Dec. 5, 2012) (report and recommendation of Carmody, M.J.),[8] *Chapman v. Parke*, No. 91-5841, 1991 WL 203080 (6th Cir. Oct. 4, 1991);[9] and *Haynes v. Ivens*, No. 08-13091, 2010

---

[8]*Longwish v. Alexis*, No. 1:12 CV 53, 2012 WL 7682812, *7  (W.D. Mich. Dec. 5, 2012) (report and recommendation of Carmody, M.J.) ("As the voluminous medical evidence submitted by Defendants amply demonstrates, Plaintiff was not denied medical treatment. To the contrary, Plaintiff received regular medical treatment within MDOC facilities and was frequently transported to an outside hospital in response to his many complaints of chest pain. Plaintiff merely disagrees with the treatment he received and, by extension, Dr. Edelman's professional medical judgment. As discussed above, however, where a prisoner merely disagrees with the treatment he received or believes he received negligent care, such simply fails to implicate the Eighth Amendment.").

[9]*Chapman v. Parke*, No. 91-5841, 1991 WL 203080, 2 (6th Cir. Oct. 4, 1991) ("The record shows that several doctors had a difference of opinion regarding Chapman's need for surgery. Chapman had a difference of opinion with various members of the Kentucky Corrections Cabinet's medical staff regarding his need for surgery. However, a difference of opinion regarding treatment

WL 420030 (E.D. Mich. Jan. 27, 2010) (Rosen, J., adopting report and recommendation of

Randon, M.J.).[10]  Doc. Ent. 44 at 32-33.

In support of his motion, Edelman provides a lengthy certification dated October 28,

2013 (Doc. Ent. 44-2).  Therein, he defends his July 29, 2011 decision (Doc. Ent. 44-2 ¶ 14) and

refers to his September 15, 2011 decision (Doc. Ent. 44-2 ¶ 29).  In conclusion, he states:

> My decision to defer the cardiac catheterization was based on my professional
> judgment.  While catheterizations are routine tests, like any surgery, they carry
> risks.  As I pointed out to the cardiologists, the patient never demonstrated any
> evidence that he suffered coronary artery disease.  While the patient did suffer
> subjective complaints of chest pain, not once in any of the hospitalizations did the
> patient exhibit elevated troponin levels, changes to his EKG, or other indications
> of possible heart damage.  His blood work remained normal, he did not have
> elevated blood pressure, diabetes, or tobacco use, all risk factors for coronary
> artery disease.  While the patient did have one possibly abnormal test out of three,
> Dr. Byler noted this test was only mildly abnormal and 'that he was at a fairly low
> risk for adverse cardiac consequences.' [*see* Doc. Ent. 46-8 at 13-16 (August 16,
> 2011 Allegiance Health Discharge Summary)].  ***At that hospitalization, it was
> determined that the etiology of the patient's pain was musculoskeletal.***
> Ultimately, the test was performed because Dr. Glick [of Michigan Heart] felt the
> patient was at significant risk of an adverse event.  However, the test was normal
> and the patient was discharged with direction to determine a non-cardiac cause for
> his continued chest pain.  I did not ignore any serious risk to the patient's health; I
> was confident that my medical judgment would be borne out, as it was, and that
> the cardiac catheterization was negative.

Doc. Ent. 44-2 ¶ 62 (emphasis added); *see also* Doc. Ent. 46-7 at 18.[11]  Furthermore, Edelman

notes that the recommendations following the April 24, 2012 catheterization included medical

---

or his need for surgery is insufficient to state a claim under the Eighth Amendment.").

[10]*Haynes v. Ivens*, No. 08-13091, 2010 WL 420030, 8 (E.D. Mich. Jan. 27, 2010) (Rosen,
J., adopting report and recommendation of Randon, M.J.) ("Plaintiff has done nothing more than
allege a reasonable difference of medical opinion between two doctors, upon which his claim cannot
proceed.") (citing *Westlake*).

[11]"Chest pain with previous mildly abnormal echocardiogram, now with no ischemic
electrocardiogram changes or elevated troponins, most likely atypical musculoskeletal pain."  Doc.
Ent. 46-8 at 13.

therapy.  Doc. Ent. 44 at 25, 32; *see also* Doc. Ent. 46-7 at 18-19 (Allegiance Health Discharge

Summary of Vlad Motoc, M.D.), Doc. Ent. 46-7 at 26-27 (Allegiance Health Cardiovascular

Procedure Report of Mark Zande, M.D.).

3.    **Plaintiff's responses emphasize that his claim against Edelman is based not just on
the denials of requests for a cardiac catheterization, but also on the September 2011
deferral of Rhodes's request for a cardiology referral "to change meds, treatment
for unstable angina."**

a.    As an initial matter, I note that attached to plaintiff's various responses (Doc. Entries 52,

55, 57 & 58) are several exhibits.  Among these are medical records from 2011 (*see* Doc. Ent. 52

at 49-88) and 2012 (*see* Doc. Ent. 52 at 89 - Doc. Ent. 52-1 at 27).  As previously noted, the

alleged facts underlying plaintiff's August 24, 2012 original complaint took place from July 25,

2011 through April 24, 2012.  Doc. Ent. 1 ¶¶ 8-99.

However, some of the response exhibits post-date this time period.  **Specifically,**

**plaintiff's filings contain evidence of events occurring in 2013.  *See*, *i.e.*, Doc. Ent. 52-1 at 28**

**- Doc. Ent. 52-1 at 43; Doc. Ent. 55 at 10-17.**  For example, it appears that on January 14, 2013,

Kenneth Jordan, M.D., MDOC Health Care, stopped the prescription for Isosorbide Dinitrate and

started a prescription for Imdur® (isosorbide mononitrate).  Doc. Ent. 52-1 at 28.

On March 7, 2013, plaintiff was seen at the Community Health Center of Branch County,

and the discharge orders and instructions stated, among other things, "consider adding Ranexa . .

. if all tests negative & continues with Angina[,]" (Doc. Ent. 52-1 at 29-35).  *See also* Doc. Ent.

52-1 at 36 (MDOC BHCS Clinical Progress Note, March 8, 2013).

On June 12, 2013, plaintiff was seen at the Community Health Center of Branch County.

Doc. Ent. 55 at 10.  On June 13, 2013, Margaret A. Ouellette, PA-C saw plaintiff for a scheduled

provider visit.  Doc. Ent. 52-1 at 37-39.  That same day, Ouellette requested RMO Review of a

request for non-formulary Ranexa.  Doc. Ent. 52-1 at 40; Doc. Ent. 55 at 11.  On June 14, 2013, Pandya approved a sixty (60) day prescription of Ranexa.  Doc. Ent. 55 at 12.  On June 18, 2013, Ouellette stopped the prescription for Imdur® and ordered sixty (60) days of Ranexa.  Doc. Ent. 52-1 at 41, Doc. Ent. 55 at 13.

Nearly one month later, on July 17, 2013, Ouellette sought RMO review, seemingly to continue Ranexa.  Doc. Ent. 55 at 14.  Pandya approved a 6 month prescription of Ranexa on July 18, 2013.  Doc. Ent. 55 at 15.  It appears that Mattox took Ranexa from August 7, 2013 to January 31, 2014.  Doc. Ent. 52-1 at 42.

In the meantime, on November 14, 2013, plaintiff completed an MDOC Health Care Request regarding a refill of his Ranexa prescription.  The November 15, 2013 response directs plaintiff to take only one (1) pill twice a day; informs plaintiff that he just received sixty (60) pills on October 30, 2013; indicates that his refill should come automatically around November 28, 2013; and notes that the approval is good through January 2014.  Doc. Ent. 52-1 at 43.

On December 20, 2013, Ouellette sought RMO Review of a request for non-formulary Ranexa.  Doc. Ent. 55 at 16.  However, on December 27, 2013, William C. Borgerding, D.O., deferred the request for approval of Ranexa, noting that Mattox had a normal cardiac catheterization in 2012.  Doc. Ent. 55 at 17.

**Plaintiff's filings also contain evidence of events occurring in 2014.  *See, i.e.*, Doc. Ent. 55 at 18-50; Doc. Ent. 57 at 4-6.**  For example, on January 26, 2014, plaintiff completed a health care request regarding chest pain and shortness of breath.  Doc. Ent. 57 at 4; *see also* Doc. Ent. 55 at 18 (MDOC BHCS Clinical Progress Note).  He was examined by Matthew W. Rieke,

R.N., who ordered a referral to Ouellette for recurrent chest pain and requested an evaluation of Mattox and a "reorder [of] [R]anexa if appropriate."  Doc. Ent. 55 at 19-20.

On January 30, 2014, Ouellette prescribed four (4) months of Imdur at 30 mg daily.  Doc. Ent. 55 at 21.  According to plaintiff, during his meeting with Ouellette, he informed her he had run out of Ranexa and was already suffering certain symptoms.  Allegedly, Ouellette informed plaintiff that Ranexa would not be renewed, as it had been disapproved by the RMO (*see* Doc. Ent. 55 at 17), and the recommendation was to prescribe Imdur again, "largely because of the cost differential."  Furthermore, plaintiff contends, Ouellette acknowledged her disagreement with this course of treatment and attributed the change to her bosses.  However, when plaintiff asked her to appeal, she stated she would not.  *See* Doc. Ent. 55 at 4.[12]

On February 10, 2014, plaintiff was seen by Randy Lindstrom, R.N. at MDOC's BHCS for an unscheduled nurse visit.  Doc. Ent. 55 at 22.  Mattox had chest pain and was sent to the Emergency Room.  *See* Doc. Ent. 55 at 23-26 (Clinical Progress Notes and Nurse Protocol).  The Clinical Progress Note states, among other things, "Inmate states that he is not taking his Imdur[] and wants to be placed back o[n] R[a]nexa."  Doc. Ent. 55 at 26.

While at Allegiance Health, plaintiff was seen by Karly Baisden, P.A. for a history and physical (Doc. Ent. 55 at 27-30), whose impression included "unstable angina[;]" Cyril Ruwende, M.D., Ph.D, FACC, for a cardiology consultation (Doc. Ent. 55 at 31-33); Zakir Sahul, M.D., for a coronary angiography and left heart catheterization (Doc. Ent. 55 at 34-35); and S. T. Reddy, M.D., for a "spect mycardial perfusion scan with pharmacologic stress[,]"

---

[12]On February 5, 2014, Mattox initiated Grievance Identifier LCF-2014-02-00159-12f3 against Ouellette, the RMO (Borgerding) and Corizon.  Doc. Ent. 55 at 42-46.

(Doc. Ent. 55 at 36-37). *See also* Doc. Ent. 55 at 38 (MDOC BHCS Daily Inpatient Clinical Note(s) from Allegiance Health).

On February 12, 2014, plaintiff was seen by Lindstrom of MDOC BHCS. Doc. Ent. 55 at 39-40 (Nurse Protocol and Clinical Progress Note). On February 24, 2014, Mattox was interviewed by Rhonda Rider, R.N. (*see* Doc. Ent. 55 at 45), at which time Mattox was allegedly told that Ouellette would be instructed to appeal the discontinuation of Ranexa. Doc. Ent. 55 at 5. MDOC BHCS administrative notes by Rider from the same date indicate that plaintiff then had an active prescription for Imdur® 30 mg daily; however, the notes also suggest discussing Ranexa and attempting another RMO approval, because Mattox was not taking Imdur® due to side effects. Doc. Ent. 55 at 47.

On February 25, 2014, plaintiff was seen by Ouellette of MDOC BHCS for a scheduled provider visit. According to the notes, Mattox had "refused [Imdur®] 30 mg at KOP medline[,]" but agreed to take an increased dose of Imdur "at night to see if he can avoid the dizziness and dysequilibrium." Doc. Ent. 48-49. Ouellette again prescribed Imdur - this time three (3) months at 60 mg daily. Doc. Ent. 55 at 50. According to plaintiff, during this visit Ouellette informed him that she would file an appeal; she had received an electronic mail "stating that the RMO felt that Plaintiff had an ulterior motive for wanting his Ranexa renewed[;]" and "she was going to increase Plaintiff's dosage of [Imdur] from 30 mg to 60 mg at the order of the RMO." Doc. Ent. 55 at 5.

On March 10, 2014, plaintiff completed a health care request regarding chest pain and severe dizziness. Apparently, he was seen by a registered nurse on March 12, 2014. Doc. Ent.

57 at 5.[13]  According to plaintiff, he was transported to Community Health Center of Branch County's Emergency Department on March 22, 2014, due to severe chest pain and dizziness. Doc. Ent. 57 at 2.

**b.**     Plaintiff's January 30, 2014 response is divided into three (3) sections.  **First, plaintiff seeks to clarify his claims against Edelman.  Doc. Ent. 52 at 7-10.**  Plaintiff takes issue with Edelman's deferrals of cardiologist Prabhu's and cardiologist Byler's July and August 2011 requests for a cardiac catheterization *and* Edelman's deferral of a September 2011 request by the on-site physician (Rhodes) for a cardiac consultation for a change in medication which, plaintiff contends, forced him to continue taking a medication (Imdur) that he could not tolerate and caused plaintiff to needlessly suffer approximately 20 months of anginal pain (from the time of Dr. Glick's October 7, 2011 recommendation for Ranexa to the June 2013 approval of Ranexa) when relief (by way of Ranexa) was readily available.  Doc. Entries 52 at 7; *see also* Doc. Ent. 52 at 8.

After citing the events of September 9 and September 15, 2011, plaintiff points to his October 7, 2011 admission to Allegiance Health for chest pain (*see* Doc. Ent. 46-7 at 45, 48-49) and Dr. Glick's recommendation for Ranexa (Doc. Ent. 46-7 at 50, Doc. Ent. 46-8 at 1).[14]  In

---

[13]It does appear that plaintiff is making document requests in conjunction with the instant case.  For example, in a response dated March 10, 2014, Sandy Osier, RHIT, Health Information Manager at Jackson Health Care, requested that Mattox "be patient for copies of Medical Records."  Doc. Ent. 55 at 41.  Also, on March 22, 2014, plaintiff completed a health care request regarding an electronic mail Ouellette allegedly received regarding the RMO's (Borgerding's) opinion regarding plaintiff's motive for seeking to renew his Ranexa prescription.  Doc. Ent. 57 at 6.

[14]In an October 7, 2011 Allegiance Health Cardiac Consultation, it was Dr. Glick's plan to increase nitrates, add in some beta blockers and add in some Ranexa.  Doc. Ent. 46-7 at 50, Doc. Ent. 46-8 at 1.  The October 8, 2011 Allegiance Health Discharge Summary by Hani Saad, M.D., reflect that, at some point, plaintiff's prescription for Isordil® was changed to Imdur®, and his discharge medications included Ranexa and Imdur.  Doc. Ent. 46-7 at 46-47.

support of this treatment plan, plaintiff cites a February 7, 2006 article titled, "Ranexa is for patients who haven't responded to other chest pain drugs[,]" Doc. Ent. 52-1 at 60-61.  Doc. Ent. 52 at 8.

According to plaintiff, his initial response to Ranexa "was a complete cessation of all anginal pain when it was administered during off-site hospitalizations[.]"  Doc. Ent. 52 at 8-9. However, when his MDOC on-site medical providers sought RMO approval for non-formulary Ranexa on October 12, 2011, Pandya deferred the request and directed Lybarger / Rhodes to discuss the request with the lead physician or Edelman (*see* Doc. Ent. 52 at 74-75, 76-77).  Doc. Ent. 52 at 9.

Plaintiff then points to his April 21, 2012 admissions to Community Health Center of Branch County (Doc. Ent. 52-1 at 92-100) and to Allegiance Health (Doc. Ent. 52 at 102-104), each for chest pain.  At Allegiance Health, plaintiff underwent a cardiology consultation on April 22, 2012, and Dr. Glick assessed that Mattox needed "a cardiac catheterization to identify the presence or absence of coronary disease and make a better treatment plan[,]" *see* Doc. Ent. 52-1 at 5-6.  Dr. Zande performed the procedure on April 24, 2012 (Doc. Ent. 52-1 at 7 [Cardiovascular Procedure Report], 14-22 [Hemodynamic Procedure Report]).  During that hospital stay, plaintiff received Ranexa / ranolazine (Doc. Ent. 52-1 at 25).  Doc. Ent. 52 at 9.

Referring to Daniel Knobloch, M.D.'s April 21, 2012 Physicians Clinical Report (Doc. Ent. 52 at 92-95) and Zande's April 2012 Cardiovascular Procedure Report (Doc. Ent. 52-1 at 7), plaintiff points out that he was diagnosed with "some tortuosity of the blood vessels[,]" and "mild cardiomegaly[.]"  However, plaintiff claims the Ranexa order was discontinued before he was discharged.  It appears that plaintiff was discharged on April 24, 2012 and that his discharge

14

medication list included Isordil® (isosorbide dinitrate) (*see* Doc. Ent. 52-1 at 8-13).  Doc. Ent. 52 at 9.

Citing drug information for Ranexa / ranolazine (Doc. Ent. 52-1 at 56-59), plaintiff notes the directions, "[d]o not suddenly stop taking this medication without consulting your doctor. Your condition may become worse when the drug is suddenly stopped.  Your dose may need to be gradually decreased."  Doc. Ent. 52 at 9.  According to plaintiff, this is what happened "when he was given the drug during off-site hospitalizations and then had it discontinued after being returned to the prison."  Doc. Ent. 52 at 9-10.

Then, plaintiff notes that approximately eleven (11) months later, he was seen on March 7, 2013 at the Community Health Center of Branch County (Doc. Ent. 52-1 at 29-34) and the March 8, 2013 discharge orders instructed, "consider adding Ranexa . . . if all tests negative & continues with Angina[,]" Doc. Ent. 52-1 at 35.  Three (3) months later, on June 14, 2013, Pandya approved a sixty (60) day prescription of Ranexa (Doc. Ent. 55 at 12).  It is plaintiff's position that, for the approximately twenty (20) months from the time of Dr. Glick's October 7, 2011 recommendation for Ranexa to the June 2013 approval of Ranexa, plaintiff endured "needless pain and suffering from anginal bouts[.]" Plaintiff represents that he "has had no anginal pain since being put on the Ranexa regimen."  Doc. Ent. 52 at 10.

Plaintiff contends that Edelman's motion for summary judgment completely ignores the physical pain and suffering portion of plaintiff's claims.  He points to ¶¶ 48 and 50 of his original complaint, wherein he describes Rhodes's September 2011 referral "for change in medications and treatment options[,]" and characterizes MDOC Grievance Identifier JCF-2011-09-01974-12d1 against Edelman and PHS/Corizon as based upon the denial of a cardiac

15

catheterization and failure to determine an alternative treatment plan (Doc. Ent. 1 ¶¶ 48, 50). Citing the August 2011 MDOC Grievance Identifier JCF-2011-08-01632-12d1, which sought a cardiac catheterization (Doc. Ent. 52-1 at 62-68), plaintiff points out that the August 10, 2011 Step I grievance response acknowledged "Cardiac Cath Denied by contractual company[,]" and "[n]o alternate treatment plan offered."  Doc. Ent. 52 at 10.

**Second, plaintiff responds to defendant Edelman's statement of facts (Doc. Ent. 44 at 7-28). Doc. Ent. 52 at 11-15.**  As to Edelman's assertion that the February 12-13, 2010 diagnosis of "atypical chest pain" at Allegiance Health (*see* Doc. Ent. 46-5 at 35-37) meant plaintiff's chest pain symptoms were not consistent with angina (Doc. Ent. 44 at 7), plaintiff points out that the July 2011 discharge summary from Allegiance Health (Doc. Ent. 52 at 51-52) notes "[a]typical chest pain before, during and after the [dobutamine stress echo][,]" and lists a diagnosis of unstable angina.

Then, plaintiff questions Edelman's assertion that the providers' references to plaintiff's chest pain as angina should be considered "tentative," Doc. Ent. 44 at 7.  In fact, plaintiff points out, the notes from his June 13, 2013 scheduled provider visit with Ouellette (Doc. Ent. 52-1 at 37-39) list angina pectoris as a chronic problem.  Furthermore, citing Mattox's November 12, 2013 list of current medications (Doc. Ent. 52-1 at 42), Mattox notes that prescriptions include Ranexa and Nitrostat.  Plaintiff asserts that Ranexa is "the only medication that has provided sustained continual relief of Plaintiff's pain[.]"  Doc. Ent. 52 at 11.[15]

---

[15]Here, plaintiff cites a February 7, 2006 article from WebMD, entitled, "Ranexa Is for Patients Who Haven't Responded to Other Chest Pain Drugs," Doc. Ent. 52-1 at 60-61.  Doc. Ent. 52 at 11.

Next, with respect to defendant Edelman's citation of the August 16, 2011 discharge summary of Kim Wilson, N.P. (*see* Doc. Ent. 44 at 17, Doc. Ent. 46-8 at 13-16), which states that Mattox most likely had atypical musculoskeletal pain, plaintiff points to the August 16, 2011 cardiology consultation notes of Richard Byler, M.D. (Doc. Ent. 52 at 63-65), whose impressions included:

> In the usual course of the events, because of the recurrent chest pain, I would proceed with a cardiac catheterization to make sure he does not have ischemic heart disease; however, this is likely to be denied by the prison system. When that is denied by the prison system, then I would simply discharge him back to the prison on medical therapy.

Doc. Ent. 52 at 11-12.

Then, plaintiff addresses what happened after Rhodes's September 9, 2011 consultation (Doc. Ent. 52 at 66-67), in which she notes that plaintiff "is unable to tolerate long acting nitrates (Imdur) due to side effect of severe dizziness[,]" and indicates that she will "request cardiology referral to change meds, treatment for unstable angina." Noting that Edelman was Corizon's Medical Director for Utilization Management from April 2009 until February 2012 and "reviewed requests for specialty services for medical necessity[,]" (*see* Doc. Ent. 52 at 24 [Answer to Interrogatory No. 1]), and citing Edelman's representation that he "would exercise his medical judgment to consult with onsite providers concerning the provision of medical care to inmates, generally when they request specialty services[,]" (*see* Doc. Ent. 52 at 24 [Answer to Interrogatory No.2]), plaintiff contends that Edelman's September 15, 2011 deferral (Doc. Ent. 52 at 71) "in effect directed Dr. Rhodes to continue to treat Plaintiff with Imdur," which was implemented by Pandya in his October 12, 2011 decision (Doc. Ent. 52 at 77), when he deferred the request for Ranexa and directed that Isosorbide Dinitrate be increased. Doc. Ent. 52 at 12-

17

13.  Furthermore, plaintiff contends that Edelman's September 15, 2011 deferral (Doc. Ent. 52 at 71) ignored the changing medication reason for Rhodes's September 9, 2011 request (Doc. Ent. 52 at 66-67).  Doc. Ent. 52 at 13.

Also, plaintiff addresses Edelman's representation that MDOC employee Pandya's October 12, 2011 decision (Doc. Ent. 52 at 77) was Pandya's, not Edelman's, and directed Rhodes "to consult with Dr. Edelman if she had further questions[,]" *see* Doc. Ent. 52 at 29 [Answer to Interrogatory No. 11].  However, plaintiff notes that Pandya's October 12, 2011 deferral (Doc. Ent. 52 at 77) states, "[p]lease discuss with lead physician or Dr[.] Edelman[,]" and, in plaintiff's opinion, indicates that "Edelman had input into the deferral."  Also, plaintiff believes that Pandya was an employee of Corizon or, if he was an MDOC employee, was contracted to Corizon at the relevant time.  Doc. Ent. 52 at 12.

It is plaintiff's position that Edelman and Pandya **both** knew of MDOC Rhodes's September 2011 request for a cardiac referral to change meds (Doc. Ent. 52 at 66-68) and Allegiance Health Glick's October 7, 2011 plan to use Ranexa to treat plaintiff's anginal symptoms (Doc. Ent. 52 at 72-73), when Edelman and Pandya **each** in turn "first denied [on September 15, 2011] the request for a cardiology referral to change meds and then [on October 12, 2011 (Doc. Ent. 52 at 77)] denied the drug Ranexa **while increasing the dosage of [Isosorbide Dinitrate] the very drug that Plaintiff's on-site treating physician Dr. Rhodes had specifically told them Plaintiff could not tolerate**."  Doc. Ent. 52 at 13 (emphasis in original).

As to defendant Edelman's representation that he "provided alternative treatment plans as appropriate[,]" Doc. Ent. 52 at 25 (Answer to Interrogatory No. 3), plaintiff notes that the August

10, 2011 Step I grievance response in MDOC Grievance Identifier JCF-2011-08-01632-12d1 (Doc. Ent. 52-1 at 62-68) acknowledged "Cardiac Cath Denied by contractual company[,]" and "[n]o alternate treatment plan offered." He also notes that the September 14, 2011 Step II grievance appeal response states, "Unstable, 407 requesting cardiology referral for change in medications, treatment options. Pending response from PHS, for cardiac consultation." Doc. Ent. 52 at 14.

As to defendant Edelman's discussion of the April 24, 2012 discharge summary (Doc. Ent. 44 at 25, Doc. Ent. 46-7 at 18-19), which listed a diagnosis of "[a]typical chest pain, suspect noncardiac etiology[,]" plaintiff points to the Hemodynamic Procedure Report (Doc. Ent. 52-1 at 14-22), which indicates that the procedure type was changed to a cath procedure, as well as Dr. Zande's and Vlad Motoc M.D.'s apparent diagnoses of "progressive angina," (*see* Doc. Ent. 52-1 at 23-24). Doc. Ent. 52 at 14.

Finally, Mattox addresses Edelman's thought process concerning the catheterization (*see* Doc. Ent. 44 at 27-28, Doc. Ent. 44-2 ¶ 62), stating, "nowhere does [Edelman] explain why he denied Dr. Rhodes' request for a cardiology referral to change medications, **the denial that ultimately was responsible for Plaintiff's continued pain and suffering for another twenty some months**[,]" from October 7, 2011 to June 2013. Doc. Ent. 52 at 14-15 (emphasis in original). Here, plaintiff represents that "[f]rom June 18, 2013 to date, since beginning to be prescribed Ranexa, Plaintiff has incurred no further episodes of anginal pain. He continues to be prescribed both Nitrostat and Ranexa, both drugs prescribed for the treatment of anginal pain, not musculoskeletal pain." Doc. Ent. 52 at 15 (citing Doc. Ent. 52-1 at 42 [November 12, 2013 Maxor Correctional Pharmacy Services Patient Profile]).

19

**Third, plaintiff responds to the authority upon which defendant Edelman relies.**

**Doc. Ent. 52 at 16-19**.  At the outset, plaintiff asserts that due to Edelman's and certain others'

deliberate indifference, plaintiff "was subjected to nearly two years of the unnecessary infliction

of pain and suffering."  Plaintiff argues that this does not constitute a difference of doctors'

opinions; rather, it constitutes "a deliberate indifference as evidenced by Defendant Edelman's

disregard and summary dismissal of Dr. Rhodes request for a cardiology referral to change

medications and **the insistence by Corizon, Inc. employees, primarily Defendant Edelman,**

**that Plaintiff be continued on a medication that Dr. Rhodes had specifically told them not**

**only was not working but which Plaintiff could not tolerate**."  Doc. Ent. 52 at 16 (emphasis in

original).

Then, after quoting *Estelle v. Gamble*, 429 U.S. 102 (1976), and noting this Court's June

24, 2013 reference to *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (*see* Doc. Ent. 27 at 6) and

July 30, 2013 reference to *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976) (*see* Doc. Ent. 32 at

8), plaintiff explains:

> The elements of Plaintiff's claim here has little to do with mental or emotional
> injury, it is the unnecessary and wanton infliction of physical pain directly
> attributable to Defendant Edelman.  The detrimental effect from Defendant
> Edelman's deliberate indifference was the continued infliction of actual physical
> pain (the anginal bouts) and the continued subjection to dizziness, fainting spells,
> headaches, and nausea, directly attributable to the drug Imdur.

Doc. Ent. 52 at 16-17.

Next, plaintiff claims he is learning disabled and informs the Court that he has had to

depend on prison paralegals throughout the grievance procedure and this litigation.  Here, he

cites *Haines v. Kerner*, 404 U.S. 519 (1972) and *Estelle*, 429 U.S. at 112, and points to a

20

November 2005 MDOC GED Completion Exemption Form and a 2007 Program Classification

Report (*see* Doc. Ent. 52-1 at 82-83).  Doc. Ent. 52 at 17-18.

      Still, whatever mistakes have been made, plaintiff claims he has adequately stated his

claim.  Specifically, plaintiff refers to certain paragraphs in his original complaint (Doc. Ent. 1

¶¶ 44, 47, 48, 55 and 81), which he claims outline the continued pain and suffering he endured,

the reasons for it, and the history of the drugs Isosorbide and Ranexa until he initiated MDOC

Grievance Identifier JCF-2011-09-01974-12d1, which was initiated before plaintiff filed his

August 24, 2012 complaint (Doc. Ent. 1).  Doc. Ent. 52 at 17-18.

      Furthermore, plaintiff cites *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001)[16] and

notes that his original complaint (Doc. Ent. 1 at 17) and the amended complaint (Doc. Ent. 38 at

12) are verified.  Plaintiff also points out that the attachments to the amended complaint include

Rhodes's September 2011 request and Edelman's September 15, 2011 decision (Doc. Ent. 38 at

33-38).  Doc. Ent. 52 at 17-18.

      Also, citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-1155 (6th Cir. 1991),[17] plaintiff

contends that:

> . . . the disregard of the on-site treating physician's request for a cardiology
> referral to change medications followed by Defendant's insistence that Plaintiff
> continue to be treated with a medication which not only did not control the
> anginal bouts, but which Plaintiff could not tolerate, goes beyond a difference of
> medical judgment, and when it results in nearly two years of continued pain and
> suffering, it is deliberate indifference, not medical malpractice.

---

[16]"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his
pleading, Fed.R.Civ.P. 56(e), a verified complaint or additional affidavit, as presented in this case,
satisfies the burden of the nonmovant to respond."  *Smith*, 250 F.3d at 1036.

[17]"[A] prisoner who suffers pain needlessly when relief is readily available has a cause of
action against those whose deliberate indifference is the cause of his suffering."  *Boretti*, 930 F.2d
at 1154-1155 (citing *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

Doc. Ent. 52 at 18-19.

Finally, plaintiff takes the position that defendants' "sole reason for denying the drug Ranexa was financial." Citing a reference to a July 9, 2012 article in the *Minnesota Star Tribune* (*see* Doc. Ent. 52-1 at 88-89),[18] plaintiff claims that "Corizon has a long history of placing cost control over concern for patient care." Doc. Ent. 52 at 19.

**c.      In his March 21, 2014 traverse / sur-reply, plaintiff takes issue with Edelman's September 15, 2011 decision.** In support of his position that he "did not and does not concede that Dr. Edelman was not deliberately indifferent when he deferred the cardiac catheterization[,]" plaintiff cites Glick's April 22, 2012 statement that Mattox "does need a cardiac catheterization to identify the presence or absence of coronary disease and make a better treatment plan[,]" Doc. Ent. 46-7 at 24-25, Doc. Ent. 55 at 1.

In fact, plaintiff claims, that the April 24, 2012 cardiac catheterization "ruled out heart disease," *see* Doc. Ent. 46-7 at 26-27, is Mattox's point. Plaintiff claims that, from the beginning, "it was 'the treatment plan' that was awry." Plaintiff points out that Rhodes's September 9, 2011 request sought a cardiology referral to change medications (Doc. Ent. 52 at 67) and Edelman deferred the request on September 15, 2011 (Doc. Ent. 52 at 68). Doc. Ent. 55 at 1.

**Then, plaintiff argues that Edelman's September 15, 2011 decision and Pandya's October 12, 2011 deferral are related.** Plaintiff notes that, on October 7, 2011, just three weeks after Edelman's decision, plaintiff was admitted to Allegiance Health for chest pain (Doc.

---

[18]*See* http://www.inthepublicinterest.org, "Resources," "Corporate Profile Project," "Corizon Health, Inc."

Ent. 46-7 at 48-49) and Dr. Glick's plan included adding in some Ranexa (Doc. Ent. 46-7 at 50, Doc. Ent. 46-8 at 1).  Plaintiff claims it was in response to Glick's October 7, 2011 recommendation that the October 12, 2011 request for RMO approval for Ranexa was submitted (Doc. Ent. 52 at 76).  Doc. Ent. 55 at 1-2.  Pandya deferred the request that same day (Doc. Ent. 52 at 77).  Comparing Pandya's decision with Edelman's September 15, 2011 decision (Doc. Ent. 52 at 68, 71), plaintiff maintains that Pandya was following Edelman's lead and Corizon's cost-cutting procedures.  Doc. Ent. 55 at 2.

Furthermore, plaintiff points out, Rhodes's 407 September 2011 Request to Dr. Edelman noted that failed outpatient therapies were "long acting nitrates, short acting work temporarily, but unstable angina still present daily[,]" and that Mattox "is unable to tolerate long acting nitrates (Imdur) due to side effect of severe dizziness[,]" Doc. Ent. 46-3 at 45-46; yet, on September 15, 2011, Edelman deferred Rhodes's request for a cardiology referral to change meds (*see* Doc. Ent. 52 at 68, 71) and on October 12, 2011, Pandya approved increasing Isosorbide Dinitrate (*see* Doc. Ent. 52 at 77).  Doc. Ent. 55 at 2.

Again, plaintiff contends that Edelman and Pandya "worked hand in hand and represented the same interests of the medical provider."  Citing *Bright v. Thompson*, 467 Fed.Appx. 462 (6th Cir. 2012),[19] plaintiff claims this is not an issue of respondeat superior; rather, plaintiff contends, "Edelman's insistence that Plaintiff be forced to take a drug that he could not tolerate and was not helping him **is** active unconstitutional behavior."  Doc. Ent. 55 at 2 (emphasis in original).

---

[19]"Bright failed to plead facts alleging that the defendants—who serve in their supervisory capacities—were personally involved in the events underlying the suit in order to state plausible claims for relief."  *Bright*, 467 Fed.Appx. at 464.

Then, in a further effort to address the respondeat superior argument, plaintiff cites "The First Report on Medical Services" filed in *Hadix v. Johnson*, Case No. 2:80-cv-73581-JF (E.D. Mich.), which allegedly identified Dr. Hutchinson as employed by CMS and the person "supervising every physician and mid-level practitioner that worked in every MDOC facility in the State of Michgian at that time, all of whom were required to report directly to Dr. Hutchinson[,]" and materials purporting to represent the history of the Corizon merger (*see* Doc. Ent. 52-1 at 84-90). Doc. Ent. 55 at 2-3.

Plaintiff then points out that Edelman "was Medical Director for Utilization Management for Corizon Health, Inc., formerly Prison Health [PHS], from April 2009 until February 2012[;]" "reviewed requests for specialty services for medical necessity[;]" and "would exercise his medical judgment to consult with onsite providers concerning the provision of medical care to inmates, generally when they request specialty services[,]" Doc. Ent. 52 at 24 (Answers to Interrogatory Nos. 1 & 2).

It is plaintiff's belief that "there is little difference between Dr. Hutchinson's responsibilities at the time of the [*Hadix*] suit and Dr. Edelman's responsibilities at the time relevant to this action." And, he points out that there was one month between Edelman's September 15, 2011 deferral of Rhodes's request (Doc. Ent. 46-3 at 45-46) and Pandya's October 12, 2011 deferral of Lybarger / Rhodes's request, which was based upon Glick's recommendation (Doc. Ent. 52 at 77). Doc. Ent. 55 at 3.

Instead of arguing whether Edelman is responsible for Pandya's actions, plaintiff points out that his motions to amend (Doc. Entries 34 and 37) seek to add Pandya as a defendant. Doc. Ent. 55 at 3-4. If Pandya is added as a defendant, plaintiff claims, he "will be able to explore in

depth to whom Dr. Pandya was responsible in his decision-making process as a regional RMO."
Doc. Ent. 55 at 4.

**Finally, after discussing the events of December 27, 2013 through February 25, 2014, plaintiff believes that Edelman and others are attempting to show that plaintiff does not need Ranexa.  Doc. Ent. 55 at 4-5.**  For example, he compares Ouellette's February 25, 2014 increase in prescription for Imdur (Doc. Ent. 55 at 50) with Pandya's October 12, 2011 direction to increase the prescription for Isosorbide Dinitrate (Doc. Ent. 52 at 77).  Plaintiff claims that he reluctantly agreed to try the increased prescription for Imdur during February 2014; however, he "continues to experience intermittent angina pain and severe nausea with this medication."  Doc. Ent. 55 at 5.

Plaintiff claims that Borgerding's December 27, 2013 deferral of Ranexa (Doc. Ent. 55 at 17) and the allegation that Borgerding thinks plaintiff has an ulterior motive in seeking a prescription for Ranexa (*see* Doc. Ent. 57 at 6), "in spite of evidence that Ranexa had been prescribed for eight months [from June 18, 2013 to January 31, 2014[20]] and in that period had freed Plaintiff from all symptoms of angina pain," directly relates to this lawsuit.  Doc. Ent. 55 at 5-6.

Plaintiff claims that, once Grievance Identifier LCF-2014-02-00159-12f3 against Ouelette, the RMO (Borgerding) and Corizon (Doc. Ent. 55 at 42-46) is exhausted, plaintiff will petition the Court to add Ouellette, Borgerding and Corizon as defendants.  Plaintiff claims he will also file "any supplemental medical records concerning the cancellation of Ranexa as well

---

[20]*See* Doc. Ent. 55 at 13 [June 18, 2013], Doc. Ent. 55 at 15 [July 18, 2013] and Doc. Ent. 52-1 at 42 [November 12, 2013].

as a copy of the RMO email referring to Plaintiff's 'ulterior' motive for wanting Ranexa, as soon as they are available."  Doc. Ent. 55 at 6.

d.      **In his April 3, 2014 filing, plaintiff takes issue with the actions of P.A. Ouellette of LCF and RMO Borgerding.**  Here, Mattox contends that Borgerding's December 27, 2013 deferral of the request for Ranexa (Doc. Ent. 55 at 17) and Borgerding's alleged comment that "Plaintiff has an ulterior motive in seeking Ranexa," (*see* Doc. Ent. 57 at 6) fly in the face of plaintiff's eight (8) months of prescriptions for Ranexa - Ouellette's June 18, 2013 prescription for sixty (60) days of Ranexa (Doc. Ent. 55 at 13) and Pandya's July 18, 2013 approval for six (6) months of Ranexa (Doc. Ent. 55 at 15) - which had freed plaintiff of his symptoms of anginal pain.  Doc. Ent. 57 at 1.

Furthermore, plaintiff claims that Ouellette's January 30, 2014 (Doc. Ent. 55 at 21) and February 25, 2014 (Doc. Ent. 55 at 50) prescriptions of Imdur ignored the medical evidence from plaintiff's medical providers that plaintiff cannot endure Imdur and it worsens his angina pain. Doc. Ent. 57 at 1-2.

Finally, plaintiff cites his March 22, 2014 MDOC Health Care Request seeking a copy of an electronic mail to Ouellette (Doc. Ent. 57 at 6) and asserts his belief that Borgerding's December 27, 2013 deferral of Ranexa (Doc. Ent. 55 at 17) is directly connected to Borgerding's electronic mail comment to Ouellette at LCF regarding Borgerding's belief that Mattox "has an 'ulterior motive' for requesting the drug Ranexa."  In support of this argument, plaintiff cites Borgerding's December 27, 2013 reason that "patient had normal cardiac cath in 2012[,]" Doc. Ent. 55 at 17, which plaintiff contends has nothing to do with the reason Ranexa was previously recommended and approved.  It is plaintiff's position that Borgerding ignored all evidence of

26

plaintiff's medical providers who requested Ranexa, of cardio specialists who recommended Ranexa, of RMO approvals of Ranexa, and of plaintiff's medical providers that plaintiff could not tolerate Imdur.  Doc. Ent. 57 at 2.

**e.      In his April 14, 2014 filing, plaintiff claims that his assertion of deliberate indifference to his chronic anginal pain "is not a new claim, but the same claim regarding his ongoing condition." Doc. Ent. 58 at 1.**  In support of this claim, he cites *Ellis v. Vadlamudi*, 568 F.Supp.2d 778 (E.D. Mich. 2008) (Lawson, J.)[21] and points out that his August 24, 2012 complaint (*see* Doc.  Ent. 1 ¶ 55) concerns Edelman's September 15, 2011 denial of Karen M. Rhodes, D.O.'s request for a cardiac referral to change medications (*see* Doc. Ent. 46-3 at 45-46).  Doc. Ent. 58 at 1.

        **In response to defendant Edelman's claim that he was not deliberately indifferent to plaintiff's need for a heart catheterization or heart medication (Doc. Ent. 56 at 2-3),** plaintiff points to Rhodes's September 9, 2011 request for cardiology referral, which acknowledged that Mattox was unable to tolerate long-acting nitrates (Imdur) based on a side-effect of severe dizziness (Doc. Ent. 46-3 at 41-42, Doc. Ent. 52 at 66-67) and Rhodes / Shepherd's September 15, 2011 request for cardiology referral to change medications as treatment for unstable angina (Doc. Ent. 46-3 at 45-46, Doc. Ent. 52 at 68, 70-71).  Plaintiff claims that Edelman's September 15, 2011 deferral ignored Rhodes's reason for requesting the

---

        [21]"The seriousness of a chronic condition may not become obvious to prison officials until some time passes, and the indifference to that condition-and the resulting pain suffered by the prisoner that equates to the infliction of punishment-may not become manifest until then as well. Such a condition is properly identified as 'ongoing,' and a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it[,]" and "plaintiff has properly exhausted his claim alleging a continuous-or 'ongoing'-Eighth Amendment violation."  *Ellis*, 568 F.Supp.2d at 783-784 & 785.

27

2:12-cv-13762-LJM-EAS   Doc # 62   Filed 07/02/14   Pg 28 of 46   Pg ID 1476

cardiology referral and included deflecting and disingenuous comments, such as "[t]reat stable angina as per guidelines[,]" Doc. Ent. 46-4 at 46, Doc. Ent. 52 at 68, 70-71. In other words, plaintiff claims that Rhodes's referral did not have anything to do with requesting another catheterization and his direction amounted to "an order to continue treatment with Imdur, the drug Dr. Rhodes explained Plaintiff could not tolerate." Plaintiff asserts that his claim is about more than a catheterization - "[i]t is about his being forced to endure ongoing and persistent pain even though relief was and is readily available." Doc. Ent. 58 at 2.

Then, pointing to Dr. Glick's October 7, 2011 recommendation for Ranexa (Doc. Ent. 46-7 at 50, Doc. Ent. 46-8 at 1), plaintiff contends that "Glick's reference to consideration whether cardiac catheterization would be helpful was to rule out any lesion that could be treated interventionally, but her emphasis was in managing Plaintiff medically, which was the reason for adding in the drug Ranexa." As for Pandya's October 12, 2011 deferral of the Lybarger/Rhodes request for Ranexa, which referred Lybarger/Rhodes to the lead physician or Edelman and increased plaintiff's Isosorbide Dinitrate (Doc. Ent. 52 at 76-77), plaintiff claims "this is evidence to support Plaintiff's 'speculation' that Dr. Pandya and Dr. Edelman worked together to deny Plaintiff Ranexa." In support of plaintiff's speculation that Edelman was involved in Pandya's decision to deny Ranexa and continue with the intolerable Imdur, plaintiff questions, "why did Dr. Pandya tell Plaintiff's onsite medical provider [Rhodes] to discuss Pandya's decision with Dr. Edelman?" Plaintiff further submits that if Pandya had worked with Rhodes to improve Mattox's chest pain, Pandya "would not have deferred the request for Ranexa." Doc. Ent. 58 at 3.

28

Moreover, plaintiff contends, "Corizon Health's corporate structure . . . establish[es] . . . a company with an ongoing history of denying medical care to prisoners."  Doc. Ent. 58 at 3-4. Plaintiff asserts that, "[a]gain and again in lawsuits filed by prisoners and their families for deliberate indifference CMS, PHS and Corizon have been found to foster an environment in which prisoner health care is sacrificed in order to provide less efficacious but cheaper medical services."  Doc. Ent. 58 at 4.[22]  It is plaintiff's position that "[w]hat CMS's and Corizon Health, Inc.'s corporate structure does establish is a continuous pattern of sacrificing the medical welfare of prisoners for the profit of the corporate structure."  Doc. Ent. 58 at 5.

**In response to Edelman's arguments regarding plaintiff's new allegations (Doc. Ent. 56 at 3-4),** Mattox contends that his case "falls under the continuing violations doctrine[,]" and that "Dr. Edelman's injuries to Plaintiff emanated from his adhering to the policies of his employer PHS (Corizon, Inc.)[.]"  Doc. Ent. 58 at 5.

Plaintiff believes that "all the doctors employed at any time by [MDOC or CMS or PHS] as RMO doctors were told to adhere to the policies of the contract provider as long as possible[,] . . . includ[ing] Dr. Borgerding who has by stopping Plaintiff's prescription for Ranexa [on December 27, 2013] continued the injury caused by Dr. Edelman whereby both doctors have adhered to Corizon's policy of putting cost savings over patient care, thus continuing the injury to Plaintiff."  Doc. Ent. 58 at 5.

Plaintiff asserts that Borgerding then started plaintiff on Imdur (seemingly referring to Ouellette's January 30, 2014 prescription for Imdur (*see* Doc. Ent. 55 at 21)).  According to

---

[22]Attached to this filing is a copy of an article by Greg Dober titled, "Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare" from the March 2014 issue of *Prison Legal News*.  Doc. Ent. 58 at 9-23.

plaintiff, his LCF onsite medical provider (Dr. Sidur), upon learning of the discontinuation of Ranexa and reinstatement of Imdur, "immediately issued a stop order on the Imdur and resubmitted a request to RMO for Ranexa."  Doc. Ent. 58 at 5.

In addition, with regard to his February 10, 2014 admission to Allegiance Health for chest pain, during which cardiologist Ruwende recommended "no changes to [Mattox's] cardiac regimen[,]" *see* Doc. Ent. 55 at 27-37, plaintiff claims to have informed the doctors that the prison would not renew Ranexa and he could not tolerate Imdur; therefore, plaintiff claims, "[t]he fact that [the] doctors did not recommend Ranexa in the face of a certain denial by the prison system has nothing to do with proving Dr. Edelman's lack of culpability in this matter." Doc. Ent. 58 at 5-6.

Furthermore, with respect to plaintiff's allegation that, in an electronic mail to Ouellette, Borgerding stated his belief that plaintiff had an ulterior motive in wanting Ranexa, plaintiff submits that the instant lawsuit is the "ulterior motive" to which Borgerding was referring. Seeming to speculate about contact between Edelman and Borgerding, it is plaintiff's position that the Corizon connection cannot be denied.  Doc. Ent. 58 at 6.

Again citing *Ellis*, plaintiff contends he is not presenting a new theory; rather, he maintains that "[n]ew allegations of current care are not barred in support of defeating summary judgment as long as they all pertain to the injury claimed in the complaint."  Doc. Ent. 58 at 6.

It is plaintiff's position that it is irrelevant whether Edelman is still employed by Corizon; apparently referring to Edelman's September 15, 2011 decision regarding Rhodes's request for "cardiology referral to change meds, treatment for unstable angina[,]" Doc. Ent. 52 at 68, and

Edelman's alleged insistence to prescribe Imdur, plaintiff claims these are "the proximate causes

of Plaintiff's enduring all these months of pain."  In other words, plaintiff claims:

> It seems unlikely that the doctors postdating Edelman were doing anything but
> continuing to follow the policies of Corizon, Inc., the same polices that Edelman
> followed.  The chain of injury here begins with Dr. Edelman's implementation of
> Corizon policies and continues through to Dr. Borgerding's action in deferring
> Ranexa.

Doc. Ent. 68 at 6.

That Pandya approved sixty (60) days of Ranexa on June 14, 2013 (Doc. Ent. 55 at 12)

and six (6) months of Ranexa on July 18, 2013 (Doc. Ent. 55 at 15), plaintiff contends, "pales

when the RMO approved drug was deferred [on December 27, 2013 (Doc. Ent. 55 at 17)] by Dr.

Borgerding who gave as a reason for deferral the 2012 normal cardio cath, a cath that was

performed **before** the drug [Ranexa] was RMO approved[.]" Doc. Ent. 58 at 6-7 (emphasis in

original).  Then, plaintiff alleges, in an email to Ouellette, Borgerding revealed his belief that

plaintiff had an ulterior motive for wanting Ranexa (*see* Doc. Ent. 57 at 6).  According to

plaintiff, "[i]t is indisputable that Defendant Edelman began the injury in this case."  Doc. Ent.

58 at 7.

Finally, plaintiff explains that, as a prisoner proceeding pro se, "he has had limited

opportunity for discovery in this case."  Citing (1) his September 13, 2013 motion to amend

(Doc. Ent. 37), (2) his March 21, 2014 sur-reply / traverse (Doc. Ent. 55 at 6), wherein he refers

to Grievance Identifier LCF-2014-02-00159-12f3 initiated on February 5, 2014 against

Ouellette, the RMO (Borgerding) and Corizon (Doc. Ent. 55 at 42-46), and (3) Grievance

Identifier JCF-2011-09-01974-12d1 initiated during September 2011 in which plaintiff claims he

is being denied proper medical treatment for Angina of the heart (Doc. Ent. 52-1 at 75-80),

plaintiff argues that (A) Edelman's October 31, 2013 motion for summary judgment (Doc. Ent. 44) should be denied and (B) plaintiff should be permitted to withdraw his motion(s) to amend (*see* Doc. Entries 34 and/or 37). Thereafter, plaintiff believes, "an attorney will file an appearance to represent him and will want to amend the complaint herself and proceed with discovery." Doc. Ent. 58 at 7.

**4.    Defendant Edelman's replies address his September 15, 2011 decision; maintain that he is not vicariously liable for Pandya's October 12, 2011 decision; explain the disagreement with Glick's April 2012 opinion; and comment on Borgerding's December 2013 decision.**

**a.**    In his February 7, 2014 filing, Edelman replies that he is not vicariously liable for Pandya's October 12, 2011 deferral of the request for a prescription of Ranexa® (ranolazine) (Doc. Ent. 46-4 at 21-22). Doc. Ent. 54 at 1-2. Citing the August 16, 2011 Allegiance Health Discharge Notes by Kim Wilson, N.P. (Doc. Ent. 46-8 at 13-16), Edelman notes that Ranexa was not prescribed as a discharge medication. Doc. Ent. 54 at 2. Furthermore, Edelman notes, Rhodes's 407 September 2011 Request to Dr. Edelman noted that failed outpatient therapies were "long acting nitrates, *short acting work temporarily*, but unstable angina still present daily[,]" (Doc. Ent. 46-3 at 45-46 (emphasis added)). Doc. Ent. 54 at 2-3. Also, although Edelman's September 15, 2011 failure to approve plaintiff for a cardiac catheterization (Doc. Ent. 46-4 at 46) referred Rhodes to Dr. Bergman, Edelman claims that Rhodes spoke with Pandya, the MDOC's Regional Medical Officer, who suggested a prescription for Isosorbide Dinitrate (*see* Doc. Ent. 46-3 at 48 [September 15, 2011 MDOC BHCS Chart Update]). Doc. Ent. 54 at 3.

Also, to the extent Pandya's October 12, 2011 deferral of the request for a prescription of Ranexa directed Lybarger / Rhodes to consult with "lead physician or Dr[.] Edelman[,]" (Doc.

Ent. 46-4 at 21-22), Edelman replies that "Plaintiff has not submitted any evidence that Dr.

Rhodes spoke to Edelman concerning the Ranexa prescription and Dr. Edelman has opined that

he was not involved in Dr. Pandya's decision to defer the Ranexa."  Doc. Ent. 54 at 3.

Moreover, Edelman notes, Panda was an MDOC employee.  Doc. Ent. 54 at 3-4.[23]

**b.**      In his April 2, 2014 filing, Edelman argues, "[t]he undisputed evidence shows that Dr.

Edelman was not deliberately indifferent to plaintiff's need for a heart catheterization or heart

medication."  Doc. Ent. 56 at 2-3.  Specifically, Edelman states that he had sound medical

reasons for disagreeing with Dr. Glick's April 22, 2012 opinion (Doc. Ent. 46-7 at 24-25), noting

he "did not believe that Plaintiff demonstrated evidence of coronary artery blockage[,]" and

opining that the April 24, 2012 catheterization by Mark Zande, M.D. (*see* Doc. Ent. 46-7 at 26-

27) and the February 2014 catheterization by Zakir Sahul, M.D. (*see* Doc. Ent. 55 at 34-35) were

both normal.  Doc. Ent. 56 at 2.  Edelman also points out that he was not involved in the October

12, 2011 decision of Dr. Pandya, an MDOC employee, to defer the request for a prescription of

Ranexa and recommend an alternate plan which included increasing plaintiff's prescription for

Isosorbide Dinitrate (Doc. Ent. 52 at 76-77).  Doc. Ent. 56 at 2-3.  According to Edelman, there

is no evidence that, had he approved a cardiology referral earlier, Pandya would have reached a

different conclusion on October 12, 2011.  Furthermore, Edelman points out, on or about

September 15, 2011, Pandya worked with plaintiff's on-site provider Rhodes to address

plaintiff's chest pain (Doc. Ent. 46-3 at 48).  Edelman argues that plaintiff has not produced

---

[23]Here, defendant Edelman relies upon *Smith v. Smith*, No. 1:12–CV–1044, 2013 WL
6158683, 3 (W.D. Mich. Nov. 25, 2013) (Bell, J., approving and adopting report and
recommendation of Scoville, M.J.) ("Haresh Pandya, M.D., is employed by the MDOC as the
'Regional Medical Officer (RMO) for the Southern Region Health Care Administration.'").

evidence to support the speculation that Pandya and Edelman worked together to deny Ranexa. Likewise, Edelman argues, reference to Hutchinson and CMS is irrelevant. Edelman asserts that speculation regarding CMS's and Corizon's corporate structures "does not establish that Dr. Edelman directed or conspired with Dr. Pandya." Doc. Ent. 56 at 3.

Also, Edelman contends that plaintiff's new allegations regarding non-party medical providers - such as those concerning Dr. Borgerding's December 27, 2013 deferral of plaintiff's Ranexa prescription (Doc. Ent. 55 at 17) or Ouellette's refusal to appeal that decision (*see* Doc. Ent. 55 at 42-46 [LCF-2014-02-00159-12f3]) - do not preclude summary judgment on behalf of Edelman. Doc. Ent. 56 at 3-4. Edelman opines that the February 2014 catheterization by Zakir Sahul, M.D. was normal (Doc. Ent. 55 at 34-35) and notes that Cyril Ruwende, M.D.'s February 10, 2014 cardiology consultation did not recommend changes to his cardiac regimen (Doc. Ent. 55 at 31-33). As for the allegation that, on February 25, 2014, Ouellette informed Mattox that the RMO (Borgerding) felt Mattox had an ulterior motive for wanting his prescription of Ranexa renewed (*see* Doc. Ent. 57 at 6), Edelman contends plaintiff is speculating that Edelman is involved in Borgerding's December 27, 2013 decision to defer plaintiff's Ranexa prescription (Doc. Ent. 55 at 77). Doc. Ent. 56 at 3. Specifically, Edelman's posits that "[p]laintiff, at the last minute, cannot allege new claims against Dr. Edelman to defeat summary judgment[,]" and "[p]laintiff has offered no evidence, beyond speculation, to support his contention that Dr. Edelman orchestrated Dr. Borgerding's [December 27, 2013] or PA Ouellette's actions." In fact, Edelman explains, he has not been employed by Corizon since February 15, 2012, almost two years before Dr. Borgerding's December 27, 2013 decision. Doc. Ent. 56 at 4.

34

**5.      Plaintiff's August 24, 2012 claims against Edelman do not survive summary judgment.**

**a.      At various points from September 15, 2011 to February 25, 2014, plaintiff was prescribed isosorbide dinitrate (or Isordil®), isosorbide mononitrate (or Imdur®)[24] and/or ranolazine (or Ranexa®).**  For example:

- **On September 15, 2011, Edelman deferred the request for "cardiology referral to change meds, treatment for unstable angina." Doc. Ent. 52 at 68.**
- The MDOC BHCS chart update from September 15, 2011 notes that "per email from DR. Pandya (RMO), sometimes [patients] intolerant of *mononitrate* can use the *dinitrate* and slowly titrate up[,]" and plaintiff was prescribed Isosorbide Dinitrate, which is available in the brand name of Isordil®.  *See* Doc. Ent. 52 at 69 (emphasis added).
- On September 23, 2011, the RMO approved Isosorbide Dinitrate (or Isordil®).  Doc. Ent. 52 at 78.
- It seems that, at the time of his October 7, 2011 admission to Allegiance Health, plaintiff was on a low dose of Isordil® (isosorbide dinitrate).  Doc. Ent. 46-7 at 50, Doc. Ent. 46-8 at 1.
- It also seems that, during his October 2011 stay at Allegiance Health, plaintiff's prescription changed from Isordil® (isosorbide dinitrate) to Imdur® (isosorbide mononitrate).  Doc. Ent. 46-7 at 46-47.
- The October 8, 2011 discharge summary from Allegiance Health lists both Ranexa® (500 twice a day) and Imdur® (30 mg daily) as discharge medications.  Doc. Ent. 46-7 at 46-47.
- **On October 12, 2011, RMO Pandya deferred the request for Ranexa®. Doc. Ent. 52 at 77.**
- On October 12, 2011, plaintiff's Isosorbide Dinitrate (or Isordil®) was increased from 2.5 mg three times daily to 5 mg three times daily.  Doc. Ent. 52 at 77-78.
- On October 21, 2011, plaintiff's Isosorbide Dinitrate (Isordil®) prescription was stopped.  Doc. Ent. 52 at 85.
- On December 19, 2011, the RMO approved Isosorbide Dinitrate (Isordil®).  Doc. Ent. 46-1 at 24.
- Pandya approved Isordil® (isosorbide dinitrate) for plaintiff on March 3, 2012.  Doc. Ent. 46-1 at 23.
- According to the History and Physical taken at the time of plaintiff's April 21, 2012 admission to Allegiance Health, plaintiff was taking Imdur® (isosorbide mononitrate), 5 mg three times per day.  Doc. Ent. 52-1 at 2-4.

---

[24]*See* http://www.merck.com/product/usa/pi_circulars/i/imdur/imdur_pi.pdf

> *Perhaps plaintiff was actually taking Isordil® or isosorbide dinitrate, rather than Imdur® or isosorbide mononitrate.*

- On April 22, 2012, while at Allegiance Health, plaintiff was given Ranolazine (Ranexa®). Doc. Ent. 52-1 at 25-27.
- However, the Allegiance Health April 24, 2012 discharge medication list includes Isordil® (isosorbide dinitrate). Doc. Ent. 52-1 at 10-13.
- On January 14, 2013, plaintiff's prescription for Isosorbide Dinitrate was stopped and he was prescribed Imdur® (isosorbide mononitrate), 30 mg daily. Doc. Ent. 52-1 at 28.
- Plaintiff was taking Imdur® (isosorbide mononitrate) on March 7, 2013. Doc. Ent. 52-1 at 29.
- Plaintiff was taking Imdur® (isosorbide mononitrate) on June 13, 2013. Doc. Ent. 52-1 at 37-39.
- On June 14, 2013, Pandya approved sixty (60) days of Ranexa. Doc. Ent. 55 at 12.
- On June 18, 2013, plaintiff's prescription for Imdur® (isosorbide mononitrate) was stopped, and he received a sixty (60) day prescription of Ranexa®. Doc. Ent. 52-1 at 41; Doc. Ent. 55 at 13.
- On July 18, 2013, Pandya approved Ranexa® for six (6) months. Doc. Ent. 55 at 15.
- As of November 12, 2013, plaintiff was taking Ranexa®. Doc. Ent. 52-1 at 42.
- **On December 27, 2013, RMO Borgerding deferred the request to approve Ranexa®. Doc. Ent. 55 at 17.**
- On January 30, 2014, plaintiff was prescribed Imdur® (isosorbide mononitrate), 30 mg daily. Doc. Ent. 55 at 21.
- On February 25, 2014, plaintiff was prescribed Imdur® (isosorbide mononitrate), 60 mg daily. Doc. Ent. 55 at 50.

Thus, notwithstanding Edelman's September 15, 2011 decision that the criteria for a referral were not met (Doc. Ent. 52 at 68), RMO Pandya's October 12, 2011 deferral of the request for Ranexa® (Doc. Ent. 52 at 77) and RMO Borgerding's December 27, 2013 deferral of the request for Ranexa® (Doc. Ent. 55 at 17), the record is replete with documentation of plaintiff's prescriptions.

**b.**     As an initial matter, I note that plaintiff appears to be mistaken about the similarity of the drug Imdur® (or isosorbide mononitrate), which Rhodes stated on September 9, 2011 plaintiff could not tolerate (*see* Doc. Ent. 52 at 66), and the drug isosorbide dinitrate (or Isordil®), which

36

Dr. Pandya ordered increased on October 12, 2011 (*see* Doc. Ent. 52 at 77-78).  Doc. Ent. 52 at 13; *see also* Doc. Ent. 52 at 8.  For example, plaintiff claims that "[e]ven though examining physicians recommended Ranexa [ranolazine] and made the Defendants aware that Plaintiff had had adverse reactions to Imdur [isosorbide mononitrate], Defendants continued to insist Plaintiff be treated with Imdur[,]" Doc. Ent. 52 at 19.

However, as noted in the above time line, following Edelman's September 15, 2011 decision, plaintiff was prescribed isosorbide dinitrate (or Isordil®).  While it appears that plaintiff received Imdur® (isosorbide mononitrate) during his October 2011 stay at Allegiance Health, Isordil® (isosorbide dinitrate) was approved during December 2011 and March 2012. And, while he may have been taking Imdur® (isosorbide mononitrate) at the time of his April 2012 admission to Allegiance Health, the discharge medication list included Isordil® (isosorbide dinitrate).  During January 2013, the prescription was changed from Isordil® (isosorbide dinitrate) to Imdur® (isosorbide mononitrate); he took Ranexa from June 2013 to approximately January 2014; and he was prescribed Imdur® (isosorbide mononitrate) during January and February 2014.

In other words, although he was prescribed Imdur® (isosorbide mononitrate) - the drug he could not tolerate - in several instances, he was also prescribed isosorbide dinitrate (Isordil®) along the way.

**c.**     More importantly, when considering only those claims against Edelman which appear in plaintiff's August 24, 2012 complaint (Doc. Ent. 1 ¶¶ 16-19, 24, 38, 50, 55, 103, 104), which span the time period from July 2011 through September 2011, plaintiff's claims against Edelman do not survive summary judgment.

37

**As to plaintiff's August 24, 2012 claim that Edelman refused to follow three (3) cardiologists' courses of treatment and that of plaintiff's health care provider MDOC Dr. Rhodes, "when the need for cardiac [catheterization] and adequate medical therapy were obvious[,]" Doc. Ent. 1 ¶ 103, plaintiff has not shown that Edelman was deliberately indifferent.** Edelman's October 28, 2013 certification explains his decision to defer the cardiac catheterization, *see, i.e.*, Doc. Ent. 44-2 ¶ 62, and plaintiff's Eighth Amendment deliberate indifference claim against Edelman cannot be based merely upon plaintiff's dissatisfaction with Edelman's medical diagnoses or treatment. *See, i.e., Ruiz v. Martin*, 72 Fed.Appx. 271, 276 (6th Cir. 2003) ("Ruiz's deliberate indifference claim must fail because it is, in essence, either a mere disagreement over his doctors' diagnoses and prescribed treatments or, at best, a claim of negligent medical treatment."); *Cooper v. Shelby County Justice Center*, No. 99-6365, 2000 WL 924604, 2 (6th Cir. June 26, 2000) ("Because Cooper admitted in his complaint that he had been examined by medical staff during his confinement at the SCJC and his allegations stem from his disagreement with the medical diagnosis and treatment provided to him, his allegations are insufficient to establish an Eighth Amendment claim for deliberate indifference to a serious medical need."); *Stanton v. Holland*, No. 98-6621, 1999 WL 1024001, 2 (6th Cir. Nov. 4, 1999) ("Stanton's essential disagreement with and dispute over the diagnosis and treatment he has received during his incarceration at FMC-Lexington is insufficient to establish an Eighth Amendment claim for deliberate indifference to a serious medical need."); *Cain v. Huff*, No. 96-1613, 1997 WL 377029, 4 (6th Cir. July 2, 1997) ("Although Cain may disagree with Dr. Huff's choice of treatment, he has failed to articulate facts which show that Dr. Huff acted with deliberate indifference."); *Morrison v. Edmondson*, No. 89-5188, 1989 WL 120629, 1 (6th Cir.

Oct. 13, 1989) ("Because Morrison's allegation of inappropriate dosage amounts is essentially a disagreement over treatment, he failed to establish deliberate indifference to his medical needs."); and *Hunter v. Seiter*, No. 86-3811, 1987 WL 44547, 1 (6th Cir. Aug. 26, 1987) ("a review of the record indicates that the defendants have not exhibited a deliberate indifference to plaintiff's special medical needs and that plaintiff has received substantial treatment for his problem despite the fact that plaintiff disagrees with that treatment.") (citing *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976)).

To be sure, as noted above, plaintiff's responses emphasize that his claim against Edelman is also based upon Edelman's September 15, 2011 decision regarding Rhodes's request for a cardiology referral to change plaintiff's medications for treatment of his unstable angina - namely Edelman's conclusion that the criteria had not been met for a cardiac catheterization (*see* Doc. Ent. 52 at 71) and Edelman's failure to address the change in medicine portion of Rhodes's request (*see* Doc. Ent. 52 at 13, Doc. Ent. 58 at 2). However, whatever plaintiff claims about the September 15, 2011 response's adequacy, there is no question that Edelman submitted a response on September 15, 2011 to Rhodes's request. In fact, Edelman's October 28, 2013 certification addresses Rhodes's "407 for cardiology consult due to failure of current treatment regimen for chest pain and denial of request for cardiac catheterization by cardiology while hospitalized[,]" Doc. Ent. 44-2 ¶ 28 (citing Rhodes's September 9, 2011 Chronic Care Visit [Doc. Ent. 38 at 33-34, Doc. Ent. 46-3 at 43-44]; *see also* Consultation [Doc. Ent. 46-3 at 41-42], Doc. Ent. 52 at 66-67) and Edelman's September 15, 2011 decision, Doc. Ent. 44-2 ¶ 29 (citing Doc. Ent. 46-3 at 46, Doc. Ent. 52 at 68). Furthermore, Edelman's September 15, 2011 decision directed Rhodes to "call Dr Bergman today." Doc. Ent. 52 at 68. Thus, at most, plaintiff's claim

that Edelman "completely ignored Dr. Rhodes' reason for requesting the referral," *see* Doc. Ent. 58 at 2, would be one of negligence or medical malpractice, not deliberate indifference to a serious medical need.

Also, plaintiff claims that for approximately twenty (20) months - from the time of Dr. Glick's October 7, 2011 recommendation for Ranexa to Pandya's June 2013 approval of Ranexa - plaintiff endured "needless pain and suffering from anginal bouts[,]" Doc. Ent. 52 at 10; *see also* Doc. Ent. 52 at 7, 14-15. Likewise, plaintiff argues that the medical therapy following Edelman's September 15, 2011 denial of Rhodes's request for a cardiology referral to change medications went beyond a difference in medical judgment. In plaintiff's opinion, it constituted deliberate indifference, not medical malpractice, because it resulted in nearly two years of continued pain and suffering. Doc. Ent. 52 at 18-19; *see also* Doc. Ent. 52 at 16.

However, plaintiff's latest claim against Edelman occurred on September 15, 2011. Doc. Ent. 1 ¶ 55. And, while Edelman's September 15, 2011 decision (*see* Doc. Ent. 52 at 68) may have had an impact on Pandya's seemingly same day advice to prescribe Isosorbide Dinitrate (*see* Doc. Ent. 1 ¶ 56, Doc. Ent. 52 at 69), and while plaintiff claims his case "falls under the continuing violations doctrine[,]" Doc. Ent. 58 at 5, plaintiff's claims against Edelman cannot be based upon an allegation that he was vicariously liable for the subsequent actions by MDOC RMO Pandya, such as his October 12, 2011 decision (Doc. Ent. 52 at 77); by MDOC PA Ouellette, such as her alleged refusal to appeal Borgerding's decision (*see* Doc. Ent. 55 at 4-5, Doc. Ent. 55 at 21); by MDOC RMO Borgerding, such as his December 27, 2013 decision (Doc. Ent. 55 at 17); and/or by Corizon (*see* Doc. Ent. 55 at 4-5, Doc. Ent. 55 at 42-46 [LCF-2014-02-00159-12f3]). "Under § 1983, there is no respondeat superior or vicarious liability." *Flagg v.*

40

*City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013).  Plaintiff's conclusion that Edelman and Pandya "worked hand in hand and represented the same interests of the medical provider[,]" Doc. Ent. 55 at 2, is conclusory at this stage.  This position is buttressed by plaintiff's admission that, should he be permitted to add Pandya as a defendant, plaintiff "will be able to explore in depth to whom Dr. Pandya was responsible in his decision-making process as a regional RMO[,]" Doc. Ent. 55 at 3-4.[25]

Furthermore, to the extent plaintiff claims the cardiac catheterization or the prescription for Ranexa was delayed, the Sixth Circuit has explained, "'[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)).  "[A]bsent some concrete physical harm, a delay in providing medication is not an 'injury' of the type contemplated by [42 U.S.C. § 1997e(e)].  First, there are the words themselves:  'physical injury.'  Congress's use of these words suggests that there must be some actual harm to the plaintiff, and that the harm must be bodily in nature.  The 'harm' alleged here, however—a delay in receipt of medication to treat plaintiff's disease—is at most merely a potential harm, possibly putting plaintiff at risk of a worsened condition.  Plaintiff does not allege that his condition did become worse as a result of not taking his medication, however, and there is no evidence that he suffered any adverse effects from the delay."  *Leon v. Johnson*, 96 F.Supp.2d 244, 248 (W.D.N.Y. 2000).

---

[25]Plaintiff's pending motions to amend (Doc. Entries 34 and 37), which seek to add Pandya as a defendant, any future motion by plaintiff to add Ouellet, Borgerding and Corizon as defendants (*see* Doc. Ent.55 at 6) will be addressed under separate cover.

Finally, to the extent plaintiff is alleging that he suffered adverse effects from the delay in getting approval for a cardiac catheterization or the delay in getting approval for Ranexa, I note that plaintiff's complaint and his January 30, 2014 response contain many references to "pain and suffering." *See, i.e.*, Doc. Ent. 52 at 7, 10, 14-19.  Those claims which relate to twenty (20) months or two (2) years of pain and suffering have been previously addressed.  However, it is prudent to comment on plaintiff's claims that Edelman was deliberately indifferent to plaintiff's "pain and suffering" when he made his deferrals and that Edelman "has completely ignored the physical 'pain and suffering' aspect of Plaintiff's claims."  Doc. Ent. 52 at 7, 10; *see also* Doc. Ent. 52 at 17.  Plaintiff's complaint describes his pain and symptoms at the time of his September 9, 2011 visit with Rhodes (Doc. Ent. 1 ¶ 45); describes MDOC Grievance Identifier JCF-2011-09-1974-12d1, which noted that he was "in constant pain and . . . suffering on a daily basis from chest pains," etc. (Doc. Ent. 1 ¶¶ 50-51; *see also* Doc. Ent. 52-1 at 75-80); and alleges that he "is being forced to live in pain and in fear of having a heart attack on a daily basis[,]" Doc. Ent. 1 ¶ 81.  Nonetheless, "[e]ven if plaintiff could show that he suffered a physical injury for purposes of § 1997e(e), . . . this claim would have to be dismissed, because plaintiff's allegations and the evidence presented do not indicate any 'deliberate indifference' to plaintiff's serious medical needs. At most, the evidence suggests that some defendants may have been negligent, but that is not enough to support a § 1983 claim."  *Leon*, 96 F.Supp.2d at 249 (citing cases).

42

**d.      As to plaintiff's August 24, 2012 claim that Edelman denied Mattox access to a**

**"cardiologist capable of evaluating the need for treatment of medical conditions which may**

**cause future heart attack or death[,]" Doc. Ent. 1 ¶ 104,** I note that "[n]o Federal civil action

may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental

or emotional injury suffered while in custody without a prior showing of physical injury or the

commission of a sexual act (as defined in section 2246 of Title 18)."  42 U.S.C.A. § 1997e(e)

("Limitation on recovery").

      The possibility that future harm might befall plaintiff is neither itself a compensable

injury, nor does it constitute "physical injury" for purposes of § 1997e(e).  *See Leon*, 96 F. Supp.

2d at 248-49; *Zehner v. Trigg*, 952 F. Supp. 1318, 1322-23 (S.D. Ind. 1997), *aff'd*, 133 F.3d 459,

461 (7th Cir. 1997).[26]  *See generally*, *Mason v. Schriro*, 45 F. Supp. 2d 709, 716 (W.D. Mo.

1999) (discussing cases and concluding that § 1997e(e) " is most frequently applied where

plaintiff alleges that defendants' actions have caused him to fear physical injury and fear for his

safety and welfare, but he fails to show any physical injury."); *but see Robinson v. Corrections*

*Corp. of America*, 14 Fed.Appx. 382, 383 (6th Cir. 2001) ("This bar [§ 1997e(e)] applies to

statutory as well as constitutional claims.") (citing *Cassidy v. Indiana Dep't of Corr.*, 199 F.3d

374, 376–77 (7th Cir.2000)); *Taylor v. United States*, 161 Fed.Appx. 483, 486 (6th Cir. 2005)

("Some courts have excluded constitutional claims from § 1997e(e). . . . However, the majority

of courts hold § 1997e(e) applies to *all* federal prisoner lawsuits.") (emphasis in original); *see*

---

[26]"[T]he term 'physical injury' in § 1997e(e) is not broad enough to encompass mere
inhalation or ingestion of asbestos particles without proof of resulting disease or other adverse
physical effects.  Plaintiffs have not pleaded a 'physical injury' within the meaning of § 1997e(e)
so that they could recover damages for mental or emotional injuries." *Zehner*, 952 F.Supp. at 1323.

*also Royal v. Kautzky*, 375 F.3d 720, 723 (8ᵗʰ Cir. 2004) ("Congress did not intend section 1997e(e) to limit recovery only to a select group of federal actions brought by prisoners. Instead, we read section 1997e(e) as limiting recovery for mental or emotional injury in all federal actions brought by prisoners."); *Searles v. Van Bebber*, 251 F.3d 869, 876 (10ᵗʰ Cir. 2001) ("The statute limits the remedies available, regardless of the rights asserted, if the only injuries are mental or emotional.").

III.    **NOTICE TO PARTIES REGARDING OBJECTIONS**:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within fourteen (14) days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231, American Federation of Teachers, AFL-CIO*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen (14) days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the

44

objections, in the same order, and labeled as "Response to Objection No.1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: July 2, 2014


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 2, 2014, by electronic means and/or ordinary mail.

                                        s/Holly A. Monda
                                        Case Manager, in the absence of Michael Williams

45