UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD MATTOX,

      Plaintiff,

v.

ADAM D. EDELMAN,

      Defendant.

Case No. 12-13762
Honorable Laurie J. Michelson
Magistrate Judge Paul J. Komives

---

**OPINION AND ORDER**
**ADOPTING IN PART REPORT AND RECOMMENDATION TO GRANT**
**DEFENDANT EDELMAN'S MOTION FOR SUMMARY JUDGMENT [62] AND**
**GRANTING EDELMAN'S MOTION FOR SUMMARY JUDGMENT [44]**

---

Plaintiff Todd Mattox, an inmate in the custody of the Michigan Department of Corrections, suffers from chest pain. Some of the physicians who treated Mattox for this condition recommended a heart catheterization while another proposed a consultation with a cardiology specialist. Defendant Dr. Adam Edelman, in his role as the Medical Director for Utilization Management for Corizon Health, refused to authorize these recommended treatments. Mattox believes that the refusals were because Dr. Edelman chose to disregard his chest pain. Mattox thus filed this lawsuit under 42 U.S.C. § 1983 alleging, among other things, that Dr. Edelman violated the Eighth (and Fourteenth) Amendments' prohibition on "cruel and unusual punishments."

All pre-trial matters have been referred to Magistrate Judge Paul J. Komives. (Dkt. 5.) Before the Court is his report and recommendation to grant Dr. Edelman's motion for summary judgment ("Report and Recommendation"). (Dkt. 62.) Mattox has objected to the Report and Recommendation. (Dkt. 66.) Having reviewed the summary-judgment briefing, the Report and

Recommendation, Mattox's objections, and Dr. Edelman's response, the Court ADOPTS IN PART the Report and Recommendation and GRANTS Dr. Edelman's motion for summary judgment.

## I.

Most of the following factual summary is taken directly from Mattox's medical records and thus is not in dispute. Where there is a factual dispute, the Court accepts Mattox's account for purposes of resolving Dr. Edelman's summary-judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In February 2010, Mattox was admitted to Allegiance Health Hospital reporting chest pain at the eight-out-of-ten level. (Dkt. 44, Def.'s Mot. Summ. J. Ex. A, Edelman's Aff. ¶ 4.) A stress test revealed no evidence of ischemia or infarction; it also showed normal ventricular function. (Edelman's Aff. ¶ 7, Dkt. 46-5, Mattox Med. R. at 236.) Mattox's troponin levels were normal (elevated levels would have suggested myocardial injury). (*Id.*)

On July 25, 2011, Mattox experienced chest pain. (Compl. ¶ 8.) A nurse at the G. Robert Cotton ("JCF") correctional facility performed an EKG, which "indicated sinus rhythm with left axis deviation." (Compl. ¶ 11.) Mattox was taken to the hospital, eventually admitted into the care of the Michigan Heart Group, and examined by a cardiologist, Dr. Arvind Prabhu. (Compl. ¶¶ 12–15; Med. R. at 409, 427.) Dr. Prabhu noted that prior to recent left-foot pain a few weeks earlier, Mattox had been "exercising quite regularly." (Med. R. at 427.) Mattox "noted on one occasion maybe two weeks ago that brisk walking and light jogging gave him some discomfort in his chest." (*Id.*) Mattox had "not tried any jogging since then." (*Id.*) Dr. Parbhu stated that Mattox did not have a history of cardiac problems, and referred to the February 2010 stress test. (*Id.* at 427–28.) Dr. Prabhu performed another stress test and found: "Abnormal dobutamine

stress echo[cardiogram][1] suggesting possible ischemia in the basal inferior wall. Negative stress

ECG. Atypical chest pain before, during and after the test. Single PAC's seen." (Med. R. at 440.)

Dr. Mohmmed Al-Shihabi discharged Mattox, providing:

> Dr. Prabhu recommended to do a cardiac cath[eterization] to rule out coronary
> artery disease. The case was referred to Dr. Edelman, the medical director at the
> prison system, who was not convinced with the results of the echo and he denied
> verbally to authorize the cardiac catheterization. And he sent a written letter
> saying that the patient does not have enough evidence for cardiac catheterization
> and he is going against the cardiologist's recommendation.
>
> The patient continued to have chest pain actually for the last couple of nights. . . .
> [W]e are still strongly recommend[ing] to have the cardiac catheterization on this
> patient as he is at risk of sudden heart attack and sudden death.

(Med. R. at 409.)

The discharge summary slightly misstates Dr. Edelman's position: at the time, Dr.

Edelman was the "Medical Director for Utilization Management for Corizon Health, Inc.,

formerly Prison Health," and was responsible for reviewing "requests for specialty consultations,

approv[ing] medically necessary requests, and provid[ing] alternative treatment plans as

appropriate." (Dkt. 52, Pl.'s Resp. to Mot. Summ. J. at Pg ID 862, 864, Edelman's Interrogatory

Resp. ¶¶ 1, 3.) Consistent with this role, Dr. Edelman's letter to Michigan Heart Group stated,

> To whom it may concern:
>
> The cardiac catheterization request for this patient is not authorized. The patient
> does not meet any standard criteria (GRACE score or Simple TIMI risk score, etc)
> for a cardiac cath and has ruled out for [a myocardial infarction]. There are no
> EKG changes, no vital sign changes and no cardiac enzyme elevations. The
> possibility of inferior wall hypokinesis on one view of the dobutamine echo is
> hardly a good reason for cardiac cath, with its attendant radiation exposure and

---

[1] "A dobutamine stress echocardiogram is a diagnostic procedure that may be used when
a doctor wants to assess the heart muscle under stress. If exercise on a treadmill is not an option
(too much stress on the heart) due to a person's medical condition, a doctor may use an
intravenous medication called dobutamine. Dobutamine causes the heart to beat faster and will
mimic the effects of exercise on the heart." John Hopkins Health Library, *Dobutamine Stress
Echocardiogram*, http://goo.gl/jqC68Q (last visited Sept. 15, 2014).

other risks. The echo interpreter states that the patient has "atypical chest pain before, during and after" the test. Please forward me any documentation you may have that states the patient has met criteria for cardiac catheterization. This patient has been in your facility the better part of a week. This is simply inexplicable and unacceptable.

Thanks for your good sense and cooperation.

Sincerely,

Adam Edelman, MD

Corizon

(Med. R. at 423; *see also* Edelman Aff. ¶ 14.)

Mattox remained in the hospital from July 29, 2011 to August 2, 2011. (Compl. ¶ 21.) On July 31, 2011, Mattox experienced another episode of chest pain and was given an EKG and treated with asprin and three nitroglycerine. (*Id.*)

On August 14, 2011, "Mattox again[] experienced symptoms of pain in his chest, [the] left side of [his] neck, shoulders and arms"; Mattox also experienced shortness of breath and dizziness. (Compl. ¶ 27.) A nurse at JCF noted that Mattox had taken three nitroglycerine tablets without relief. (Med. R. at 113.) An EKG revealed "[l]eftward axis" deviation. (Med. R. at 113.) At 11:50 p.m., the nurse called Physician Assistant Adrianne Neff at her home. (Compl. ¶¶ 29–31.) Neff reviewed a fax of the EKG and the nurse conveyed some of the information in Mattox's file. (Compl. ¶ 31.) The nurse's notes summarize the outcome of the call: "Per authorization of PA, inmate was sent back to his housing unit, but instructed to call if anything changes. Inmate states he has Aspr[i]n in his unit, but only the 81 mg. Inmate instructed to notify officer to alert [healthcare] if anything changes.[] Told to rest and that he would be seen 8/15/11

by MP CC and DWH ER notified.—call made previous to see if Ambulance was available."[2] (Med. R. at 114.)

When Mattox's pain persisted into the next morning (August 15) Mattox was examined by Dr. Karen Rhodes. (Compl. ¶¶ 34–36.) Dr. Rhodes noted, "no change in EKG from last night, and no more nitro SL due to low blood pressure." (Compl. ¶ 36.) Dr. Rhodes had Mattox transported to the hospital via ambulance. (Compl. ¶ 36.) The next day, Mattox was examined by Dr. Richard Byler, another physician associated with Michigan Heart Group. (Compl. ¶ 37.) Dr. Byler offered this impression:

> Mr. [Mattox] is a 45-year-old, black male, with chest discomfort. There are some typical and atypical features. He has ruled out for a myocardial infarction. There are no ischemic electrocardiogram changes. He did just have a mildly abnormal stress echocardiogram last month, but it is a fairly low risk scan for adverse cardiac events. I cannot increase his medications further at this time because his blood pressure is already borderline low. In the usual course of the events, because of the recurrent chest pain, I would proceed with a cardiac catheterization to make sure he does not have ischemic heart disease; however, this is likely to be denied by the prison system. When that is denied by the prison system, then I would simply discharge him back to the prison on medical therapy.

(Med. R. at 371.) As this note predicted, Dr. Edelman denied authorization for the cardiac catheterization. (Compl. ¶ 38; *see also* Edelman Aff. ¶ 21; Med. R. at 250.)

On August 17, 2011, Mattox saw Dr. Rhodes for a post-hospitalization follow-up exam. (Med. R. at 129–30.) She wrote, "CAD [coronary artery disease]–poor—begin Imdur-30 mg daily, continue present meds, followup next week as apptd." (Med. R. at 130.)

On September 9, 2011, Mattox was assessed by Dr. Rhodes. (*See* Med. R. at 141–44.) Dr. Rhodes noted that Mattox had been having moderate chest pain on a daily basis, lasting for five

---

[2] Although Mattox sued Neff for this decision, District Judge Thomas L. Ludington, on the recommendation of the magistrate judge and over Mattox's objections, granted Neff's motion to dismiss and dismissed her from this case. (Dkt. 32, July 30, 2013 Op. & Order.) (Pursuant to administrative order, this case was subsequently reassigned from Judge Ludington to the undersigned.)

to ten minutes at a time. (*Id.* at 143.) Rhodes discontinued Imdur, noting that the medication caused Mattox "severe" dizziness. (*Id.* at 144.) She wrote in Mattox's chart, "407 for cardiology consult submitted due to failure of current treatment regimen for angina and denial of request for cardiac cath by cardiology while hospitalized." (*Id.* at 404.) On the "407" request form, Dr. Rhodes informed the reviewer as follows:

> 45 [year old] [black, male] with unstable angina. Recent hospitalization produced cardiology for cardiac cath, which was denied. I[n]mate has daily angina with any exertion, and sometimes at rest, relieved with 1–3 [nitroglycerin sublingual]. [He] is unable to tolerate long acting nitrates (imdur) due to side effect of severe dizziness.

(Med. R. at 141.) In the comments section of the request, Dr. Rhodes wrote, "request cardiology to change meds, treatment for unstable angina." (*Id.* at 142.)

Dr. Edelman was the reviewer. On September 15, 2011, he responded as follows: "ATP [alternative treatment plan] – this patient ruled out at the hospital, and did not meet the criteria for a cath. We did not 'deny' anything. You need to call Dr[.] Bergman today. Treat stable angina as per guidelines. Follow on site." (Med. R. at 146.) Dr. Edelman explains, "I noted [in my response to Dr. Rhodes] that we had not denied anything and recommended that Dr. Rhodes contact Dr. Bergman for further discussion of the patient's case." (Edelman Aff. ¶ 29.)

That same day, Dr. Rhodes updated Mattox's chart. (*See* Med. R. at 148.) She noted that she had received an email from Dr. Harseh Pandya, the regional medical officer, informing her that some patients who could not tolerate a mononitrate (e.g., Imdur) could instead use a dinitrate (e.g., Isordil) and then titrate up. (*Id.*)

Mattox saw Dr. Rhodes again on September 23, 2011. (Med. R. at 160.) She noted, "Chest pain. This has been occurring for 5–10 minutes. Frequency: daily. The severity is described as severe. It radiates to the neck. Associated symptoms include nausea and dizziness.

This is exacerbated by exertion. It is relieved by [nitroglycerine]." (*Id.*) Apparently, Mattox had not yet received the dinitrate; Dr. Rhodes remarked, "spoke with D[r]. Pandya and got RMO for it. [F]ollowup in 2 weeks to assess effect of this med on the angina." (*Id.* at 161.) (An addendum to Dr. Rhodes' September 15, 2011 notes provides that Dr. Pandya informed Dr. Rhodes that "the dinitrate is on formulary, no RMO [authorization] needed . . . ." (Med. R. at 148.))

On October 6, 2011, Mattox experienced two more episodes of chest pain with associated symptoms. (Compl. ¶ 58; Med. R. at 350.) The second episode lasted several hours. (Med. R. at 350.) Mattox was taken and admitted to the hospital, where he was examined by a cardiologist, Dr. Cathy Glick. (Compl.¶¶ 63–64.) Dr. Glick provided that Mattox's EKGs and troponins were normal. (Med. R. at 350.) Her plan: "I am going to increase his nitrates, add in some beta blockers, and add in some Ranexa. Hopefully this will control his angina symptoms. Obviously, we need to consider whether cardiac catheterization would be more helpful looking for a lesion that could be treated interventionally if we cannot manage him medically. Future consideration for coronary CT angiogram could also be given." (Med. R. at 351.)

On October 10, 2011, Mattox had a follow-up exam with Dawn Lybarger, a nurse practitioner at JCF. (Med. R. at 169–70; *see also id.* at 171.) She noted that the hospital had ordered Renexa for Mattox, but the medication required regional medical officer approval. (Med. R. at 171.) She further noted, "[patient] has been on Isosorbide Dinitrate . . . for angina and has continued to have chest pain and have recurrent hospital and ER trips." (*Id.*)

Dr. Pandya did not authorize Renexa. On October 12, 2011, he responded to Lybarger's request with, "Deferred. Please discuss with lead physician or Dr[.] Edelman." (Med. R. at 172.) He provided that Mattox's prescription of isosorbide dinitrate should be increased. (*Id.*)

Less than two weeks later, on October 21, 2011, Dr. Rhodes noted, "5 mg isosorbide [dinitrate] knocks [Mattox] out, causes severe dizziness and low [blood pressure], but he has no chest pain, uses [a half] tab when this occurs. [He is] using [it] with meals." (Med. R. at 188.)

Over the following months, Plaintiff continued to experience chest pain. In November 2011, Mattox was sent to the hospital for chest pain. (Edelman Aff. ¶ 41.) In January 2012, Mattox reported that his chest pain was occurring more frequently. (Edelman Aff. ¶ 43.) "On February 21, 2012, Mattox felt [lightheaded] and dizzy and fell to the ground[,] hurting his ribs." (Compl. ¶ 78.)

In April 2012, Mattox was again admitted to the hospital for chest pain. (Compl. ¶¶ 83–92; Edelman Aff. ¶ 39.) Dr. Glick noted that Mattox had a "long history" of exertional chest discomfort relieved with nitroglycerin, that a recent stress echocardiogram "suggested inferobasilar ischemia," and that Mattox's symptoms were "highly suspicious for multivessel coronary artery disease and possibly left main coronary stenosis." (Med. R. at 325.) Dr. Glick opined, "At this point he does need a cardiac catheterization to identify the presence or absence of coronary disease and make a better treatment plan. He has had so many hospitalizations that it is clearly more cost effective to take him for cardiac catheterization than to keep readmitting him through the ER with multiple labs and EKGs." (*Id.*)

By this time, Dr. Edelman was no longer working for Corizon. (Dkt. 66, Pl.'s Objs. at 16.) His replacement, Dr. Gibson, approved the request for cardiac catheterization. (*Id.* at 16–17.)

The procedure was performed on April 24, 2012, by Dr. Mark Zender. (*See* Med. R. at 326.) Dr. Zender noted that "[t]here was some tortuosity of the blood vessels." (*Id.*) But his "impression" was "[n]ormal left ventricular function," "[n]ormal coronary arteries, codominant

system," and "[n]ormal left ventricular hemodynamics." (*Id.*) And his "recommendations": "[m]edical therapy." (*Id.*) Despite Dr. Zender's "normal" findings, Mattox stresses that certain post-procedure notes include a diagnosis of "progressive angina." (Dkt. 52, Pl.'s Resp. to Mot. for Summ. J., App'x at 75–76.) Mattox's discharge summary, completed by Dr. Vlad Motoc, provides that the catheterization revealed "unremarkable findings" and that Mattox was examined on April 24, 2012 and found to be "chest pain free." (Med. R. at 319.) Mattox's discharge diagnosis was "[a]typical chest pain, suspect noncardiac etiology." (Med. R. at 318.)

In June 2013, Dr. Pandya prescribed Mattox Renexa. (Dkt. 66, Pl.'s Objs. Ex. 12.) Mattox states that when he is on Renexa, he has "no angina chest pain." (Pl.'s Objs. at 9.) Mattox thus concludes that he endured 20 months of "needless pain and suffering from angina bouts" as Dr. Glick had recommended Renexa back in October 2011. (Dkt. 52, Pl.'s Resp. to Mot. Summ. J. at 3.)

## II.

This Court conducts a *de novo* review of those portions of the Report and Recommendation to which Mattox has objected. 28 U.S.C. § 636(b). The Court need not perform a de novo review of the Report's unobjected-to findings. *See Schaefer v. Modelski*, No. 13-CV-13669, 2014 WL 3573270, at *1 (E.D. Mich. July 21, 2014) ("Although a court must review timely objections to a magistrate judge's report and recommendation, a court may adopt, reject, or amend the portions of a report and recommendation to which no party properly objects." (citing Fed. R. Civ. P. 72(b)(3); *Thomas v. Arn*, 474 U.S. 140, 150 (1985))); *Garrison v. Equifax Info. Servs., LLC*, No. 10-13990, 2012 WL 1278044, at *8 (E.D. Mich. Apr. 16, 2012) ("The Court is not obligated to review the portions of the report to which no objection was made." (citing *Arn*, 474 U.S. at 149–52)).

Because Dr. Edelman seeks summary judgment on a claim that Mattox bears the burden of persuasion on at trial, Dr. Edelman can discharge his initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Mattox's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Dr. Edelman does so, Mattox "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Mattox's claims to a jury, or whether the evidence is so one-sided that Dr. Edelman must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). As noted at the outset, in making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Mattox. *Matsushita*, 475 U.S. at 587.

### III.

Mattox raises eight objections to the Report and Recommendation. But they can be resolved by focusing on two issues: Dr. Edelman's denials of the catheterization requests by other doctors and his denial of a cardiac consult requested by Dr. Rhodes. The magistrate judge concluded that Dr. Edelman did not act with deliberate indifference in denying other physicians' catheterization requests, reasoning that Mattox had shown only that Dr. Edelman's medical judgment differed from that of Drs. Prabhu and Byler, and that a mere disagreement in medical judgment does not rise to the level of deliberate indifference. (*See* R&R at 38–39.) Mattox objects that when the catheterization was finally performed in April 2012, it revealed tortuosity of his blood vessels, and, thus, had Dr. Edelman approved the procedure when Dr. Prabhu initially recommended it in July 2011, "Plaintiff could have got treatment for [his vessel

10

tortuosity], and also Ranexa treatment which would have helped in treating and controlling Plaintiff's angina chest pain." (Pl.'s Objs. at 17.) The magistrate judge also concluded that Dr. Edelman did not act with deliberate indifference in failing to send Mattox for a cardiology consultation as recommended by Dr. Rhodes in September 2011. (R&R 39–41.) Mattox objects that because Dr. Edelman knew from Dr. Rhodes' request that Imdur was not effective in treating his chest pain (and caused side effects), that Dr. Edelman acted with deliberate indifference by denying Dr. Rhodes' request for a cardiology consultation and by continuing Mattox on Imdur. (*See* Pl.'s Objs. at 3–7, 21, 23.)

The Court will overrule both objections.

## A.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To demonstrate an Eighth Amendment violation based on medical mistreatment, a prisoner must satisfy both objective and subjective components. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore*, 390 F.3d at 895. "The subjective component requires an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care." *Id.* (internal quotation marks omitted). The degree of culpability is greater than negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). A reasonable jury must be able to conclude that Dr. Edelman

11

was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that Dr. Edelman in fact "dr[e]w the inference." *See Farmer*, 511 U.S. at 837. In short, the summary-judgment record must permit a reasonable jury to find that Dr. Edelman knew of, yet chose to disregard, an "excessive risk" to Mattox's health. *See id.*

**B.**

The Court agrees with the magistrate judge that Dr. Edelman did not act with deliberate indifference when he denied requests for a cardiac catheterization by other physicians.

As an initial matter, the Court finds record support for only two denials, not three as Mattox claims. Mattox says that Dr. Edelman denied a third catheterization request "on October 7, 2011 by cardiolog[ist] Dr. Glick." (Pl.'s Objs. at 16.) But on October 7, 2011, Dr. Glick merely mentioned a prior denial of catheterization request, prescribed medications, and stated, "Obviously, we need to *consider* whether cardiac catheterization would be more helpful for looking for a lesion that could be treated interventionally *if we cannot manage him medically*." (Med. R. at 351 (emphases added)). This conditional remark is not reasonably interpreted as a request. This conclusion is strengthened by comparing Dr. Glick's statement from April 2012: "At this point he does need a cardiac catheterization to identify the presence or absence of coronary disease and make a better treatment plan. He has had so many hospitalizations that it is clearly more cost effective to take him for cardiac catheterization than to keep readmitting him through the ER with multiple labs and EKGs." (Med. R. at 325.) When Dr. Glick wanted to make a catheterization request, she was direct. Mattox has cited no evidence that Dr. Edelman ever received a comparable request from Dr. Glick in October 2011, instead relying solely on her conditional statement. As such, no reasonable jury could find that Dr. Edelman denied a third catheterization request in October 2011.

The first denial came in July 2011. Mattox experienced chest pain and an EKG "indicated" sinus rhythm with left axis deviation. After Mattox was taken the hospital, a stress echocardiogram suggested "possible" ischemia in the basal inferior wall. But Dr. Edelman explained to Drs. Prabhu and Al-Shihabi, the physicians who recommended the cardiac catheterization, that Mattox had not met "any standard criteria (GRACE score or Simple TIMI risk score, etc) for a cardiac cath[eterization]" and was "ruled out for [a myocardial infarction]." Dr. Edelman's letter to the physicians further explained, "[t]here are no EKG changes, no vital sign changes and no cardiac enzyme elevations. The possibility of inferior wall hypokinesis on one view of the dobutamine echo is hardly a good reason for cardiac cath, with its attendant radiation exposure and other risks." Dr. Edelman requested that the physicians provide "any documentation" they had stating that Mattox "met criteria for cardiac catheterization." Dr. Edelman also avers,

> Under the GRACE Risk Model and the TIMI Risk Score, reported chest pain and possible minor wall motion abnormality in one stress test does not indicate the need for a cardiac catheterization. . . . In my professional judgment, the cardiologists at issue were not considering the patient's full condition before recommending the cardiac catheterization. Based on my review of the medical records and current research, the patient never demonstrated change in his EKG readings, elevated serum cardiac biomarkers or other indications that he was at risk for an adverse cardiac event.

(Edelman Aff. ¶¶ 12, 14.)

Given the foregoing, Dr. Edelman's medical reasons for denying the cardiac catheterization, coupled with his request for additional information so that he could further evaluate the propriety of the procedure, and coupled with the fact that Plaintiff continued to receive treatment for his chest pains, precludes any reasonable jury from finding that Dr. Edelman elected to disregard what he perceived to be a serious risk to Mattox's health. *See Farmer*, 511 U.S. at 844 (providing that a prison official charged with deliberate indifference

13

could avoid liability, even if he was aware of facts indicating a substantial danger to the inmate, if the official "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[W]e have held that a difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference. . . . To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."); *Acord v. Brown*, 43 F.3d 1471 (6th Cir. 1994) ("[A] § 1983 claim based on the Eighth Amendment is not present when a doctor disagrees with the professional judgment of another doctor, as there are several ways to treat illness."). *Cf. Mitchell v. Hininger*, 553 F. App'x 602, 606 (6th Cir. 2014) ("Choosing one doctor-supported treatment regimen over another doctor-supported treatment regimen does not amount to deliberate indifference.").

The same reasoning applies to Dr. Edelman's second denial of a request for catheterization. That denial came in August 2011, when Mattox again experienced an episode of chest pain that led JCF staff to send him to the hospital. Once there, Dr. Byler provided, "In the usual course of the events, because of the recurrent chest pain, I would proceed with a cardiac catheterization to make sure he does not have ischemic heart disease; however, this is likely to be denied by the prison system." But Dr. Byler also implied that Mattox's risk of a sudden cardiac event was minimal: "[Mattox] has ruled out for a myocardial infarction. There are no ischemic electrocardiogram changes. He did just have a mildly abnormal stress echocardiogram last month, but it is a fairly low risk scan for adverse cardiac events." And Mattox's discharge summary, completed by a nurse practitioner, provides a discharge diagnosis of "[c]hest pain with previous mildly abnormal echocardiogram, now with no ischemic electrocardiogram changes or

14

elevated troponins, most likely atypical musculoskeletal pain." (Med. R. at 363.) In view of these benign treatment records, Mattox has not shown that Dr. Edelman's second denial of a cardiac catheterization procedure, just one month after his initial denial, was unreasonable, let alone deliberately indifferent conduct.

Mattox resists the conclusion that Dr. Edelman did not act with deliberate indifference in denying the two catheterization requests by arguing that when the catheterization was finally performed, it revealed tortuosity of his blood vessels, and, thus, Dr. Edelman's denials of the procedure caused him to suffer months of unnecessary chest pain. (Pl.'s Objs. at 17.) In Mattox's words, "On July 25, 2011 (when Dr. Prebhu made the recommendation for the cath), if the cath would have been done and shown tortuosity of the blood vessels, Plaintiff could have got treatment for that, and also Ranexa treatment which would have helped in treating and controlling Plaintiff's angina chest pain." (*Id.*)

The record reflects that Mattox would not be able to establish a factual premise of this argument at trial: that the catheterization results were such that he would have received different or better treatment had he undergone the procedure in July 2011. It is true that Dr. Zender, the physician who performed the catheterization, noted on his procedure report that Mattox had "some" blood-vessel tortuosity. But Mattox's argument overlooks the fact that Dr. Zender's "impression" did not include that finding, but instead consisted of exclusively normal findings. Moreover, the discharge summary completed by Dr. Motoc provided that the catheterization revealed "unremarkable findings." Mattox's discharge diagnosis was "[a]typical chest pain, *suspect noncardiac etiology*." (Emphasis added.) Regarding Renexa in particular, nothing suggests that Mattox would have been prescribed that medication had the catheterization been performed. Dr. Zender's recommend course of treatment was not Renexa specifically, but

15

instead "[m]edical therapy" generally. And, Dr. Glick in fact recommended Renexa in October 2011 instead of a catheterization. As such, Mattox has not shown that a reasonable jury could find that the catheterization procedure—with all of its unremarkable findings—would have warranted a different course of treatment than what he was in fact provided. In other words, the mere fact that the procedure ultimately showed one abnormal finding, against a normal "impression" and a summary remark of "unremarkable findings," does not, in light of other information considered by Dr. Edelman in denying the procedure, show that he acted with deliberate indifference in denying the procedure.

In short, the Court agrees with the magistrate judge that Dr. Edelman did not act with deliberate indifference in denying the catheterization requests of other physicians.

## C.

Mattox also complains about Dr. Edelman's response to Dr. Rhodes' September 2011 cardiac consultation request Dr. Rhodes' request explicitly stated that Mattox was experiencing "unstable" angina on a daily basis during "any" exertion and "sometimes" even at rest. Dr. Rhodes also informed Dr. Edelman that Mattox had been unable to tolerate the angina medication he had been prescribed, because Imdur caused "severe" dizziness. Thus, a reasonable jury could conclude that Dr. Edelman knew that Mattox was suffering from daily chest pain (presumably an objectively serious medical need) and that his medication caused a significant side effect. Or, in Eighth Amendment terms, a jury could find that Dr. Edelman was "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Mattox] exist[ed]" and that Dr. Edelman in fact "dr[e]w the inference." *See Farmer*, 511 U.S. at 837.

But this does not end the deliberate indifference inquiry, for Mattox must also show that a reasonable jury could find that Dr. Edelman disregarded the inference he drew. Mattox argues

that a jury must answer the conscious-disregard inquiry because Dr. Edelman's response—"You need to call Dr[.] Bergman today. Treat stable angina as per guidelines. Follow on site"— directed Dr. Rhodes to continue treating Mattox with Imdur, "a medication that had proven ineffective" and that caused side effects. (Pl.'s Objs. at 3; *see also id.* at 4–5, 7, 10–11, 14–15, 20–21, 23, 29–31; Dkt. 72, Pl.'s Reply to Resp. to Objs. at 8.) Mattox also points out that Dr. Rhodes informed Dr. Edelman that his angina was "unstable," but Dr. Edelman's treatment plan was for "stable" angina. (*Id.* at 2.)[3]

In further support of his conscious-disregard argument, Mattox cites case law providing that where a physician persists with treatment that the physician knows is ineffective to treat a prisoner's serious medical need, the physician may be found to have acted with deliberate indifference to that need. (Pl.'s Objs. at 3, 20 (citing *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("For [a] year-and-a-half the defendants doggedly persisted in a course of treatment [for plainitff's ulcer] known to be ineffective, behavior that we have recognized as a violation of the Eighth Amendment."); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("We have . . . held that deliberate indifference may be established . . . by a decision to take an easier but less efficacious course of treatment."); *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990) ("What separates this complaint from ordinary allegations of medical malpractice are (1) allegations that the doctor intended to inflict pain on prisoners without any medical justification and (2) the sheer number of specific instances in which the doctor allegedly insisted on continuing courses of treatment that the doctor knew were painful, ineffective or entailed

---

[3] Mattox says that "'Unstable angina refers to angina in which the pattern of symptoms changes, because the characteristics of angina in a given person usually remain constant, any change—such as more 'severe pain,' more frequent attacks or occurring with less exertion or during rest—is serious.'" (Dkt. 72, Pl.'s Reply to Resp. to Objs. at 7 (quoting Merck Manual of Medical Information Home Edition 121–22 (1997))).

substantial risk of serious harm to the prisoners."); *W. v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) ("Although the plaintiff has been provided with aspirin [following his leg surgery], this may not constitute adequate medical care. If 'deliberate indifference caused an easier and less efficacious treatment' to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care."); *Sildack v. Corizon Health, Inc.*, No. 11-12939, 2013 WL 5435293, at *10–11 (E.D. Mich. Aug. 23, 2013) (Whalen, M.J.) *report and recommendation adopted by* 2013 WL 5435293 (E.D. Mich. Sept. 30, 2013) (Hood, J.) (finding that the question of whether Dr. Edelman acted with deliberate indifference should be presented to a jury where, among other things, Dr. Edelman refused to follow the treatment recommendations of three physicians)).) The Court has reviewed these cases and two are comparable enough to discuss in detail. But when their facts are explored, they stand apart rather than in line with this case.

In *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), the plaintiff, Donald Greeno, suffered from severe heartburn and vomiting (with blood) and alleged that defendants (doctors, nurses and other department of corrections' staff) continued to disregard these serious medical problems for two years. Two of the defendants served in roles not dissimilar from Dr. Edelman's authorizing role at Corizon. Dr. George Daley was the medical director for the department of correction's health services bureau and Sharon Zunker was the bureau's director. *Id.* at 649–50. Although the district court granted summary judgment in favor of Dr. Daley and Zunker, the Seventh Circuit reversed, holding that there were fact issues as to whether Dr. Daley and Zunker acted with deliberate indifference. *Id.* at 652, 654–55.

The problem with Mattox's reliance on *Greeno* is that both Dr. Daley's and Zunker's conduct were markedly more severe than Dr. Edelman's. The Seventh Circuit explained that Dr.

18

Daley had refused "over a two-year period to refer Greeno to a specialist or authorize an endoscopy" and that he (albeit along with other defendants) had "doggedly persisted [for a year-and-a-half] in a course of treatment known to be ineffective." *Id.* at 655. In addition, Dr. Daley had "issued an emphatic ban on treatment," including proscribing pain medications despite Greeno's repeated complaints of pain. *Id.* As for Zunker, her failure to respond to Greeno's "persistent requests for a bland diet" or acknowledge his "repeated contentions" that Maalox was ineffective, coupled with her awareness of Greeno's complaints of "severe pain" and "repeated requests to be seen by a specialist," supported a reasonable inference of deliberate indifference where Zunker merely turned over Greeno's complaints to staff who did nothing. Here, Dr. Edelman never denied treatment to Plaintiff. While he denied a specific medical test and a consult with a specialist, Plaintiff was always maintained on a medication regimen, treated with prison medical personnel, and was sent for hospital care when warranted. Moreover, Mattox had only been prescribed Imdur for about a month when Dr. Edelman denied Dr. Rhodes' request for a cardiology consult. This stands in stark contrast to the "dogged[]" application of ineffective treatment in *Greeno*. Moreover, in her 407 request to Dr. Edelman, Dr. Rhodes noted that Mattox's "daily angina with any exertion and sometimes at rest" was "*relieved* with 1–3 [nitroglycerin sublingual tablets]." Finally, unlike the defendants in *Greeno*, it is far from plain that Dr. Edelman even persisted with ineffective treatment: he did not explicitly tell Dr. Rhodes to continue to prescribe Imdur, he instead more generally provided that Dr. Rhodes should contact Dr. Bergman about Mattox's treatment and that Dr. Rhodes was to treat Mattox's angina "per guidelines." Indeed, Mattox was subsequently switched to dinitrate on Dr. Pandya's recommendation, a formulary medication different than Imdur. In short, Dr. Edelman's actions toward Mattox's risk of severe harm was nothing like that of Dr. Daley or Zunker in *Greeno*.

19

In *Sildack v. Corizon Health, Inc.*, No. 11-12939, 2013 WL 5435293 (E.D. Mich. Sept. 30, 2013), an MRI revealed that Sildack—who had already suffered from severe back pain for many months—had "nerve root displacement." *Id.* at *3–4, 7, 10. Three physicians advocated similar treatment: one sought a neurosurgery consult and told Sildack that he would recommend surgery; another recommended imaging studies, steroid injections, and possible surgery; and a third recommended another MRI and steroid injections. *Id.* at *7–8. The court explained that Dr. Edelman's denial "of steroid injections, an MRI of the upper extremities, and possible surgery [flew] in the face of [these] recommendations." *Id.* at *10. Dr. Edelman also denied a request for a follow-up exam with one of the three physicians (which was advocated for by a fourth physician) in favor of having prison staff observe Sildack's daily activities. *Id.* And even when the observations were consistent with the recommendations for further treatment and consultation, Dr. Edelman still denied the request. *Id.* The court reasoned, "The fact that Dr. Edelman requested and received additional information, yet disregarded that information, suggests deliberate indifference." *Id.* at *11. Further still, Dr. Edelman's alternative treatment plan for nerve root displacement was merely aerobic exercise, yoga, and stretching. *Id.*

Dr. Edelman's conduct was similar but materially different in this case. First, as noted, Dr. Rhodes, although informing Dr. Edelman that Imdur was not effective, provided that nitroglycerine had worked to relieve Mattox's chest pain. Second, in *Sildack*, when Dr. Edelman requested further information, he, in the court's words, "*ignored* all of the relevant medical evidence"—Dr. Edelman's request and disregard of additional information in *Sildack* "suggest[ed] deliberate indifference." *Id.* at *11. Here, Dr. Edelman's conduct was different: upon receiving Dr. Rhodes' request, Dr. Edelman instructed Dr. Rhodes to confer with another physician and continue to treat Mattox per prison guidelines, which, as discussed, did not

necessarily mean to continue prescribing Imdur. He did not ask Dr. Rhodes to obtain more information and then disregard information that confirmed the need for a cardiology consult. Third, in *Sildack*, Dr. Edelman essentially rejected a course of treatment advocated by several physicians—here, only Dr. Rhodes believed a cardiology consult was necessary to prescribe Mattox the proper medication.

While the issue is a close one, the Court ultimately concludes that Dr. Edelman's response to Dr. Rhodes, taken in context of Mattox's course of treatment up to that point, does not permit a reasonable jury to conclude that Dr. Edelman elected to disregard Mattox's chest pain.

### D.

Before concluding, the Court briefly addresses a related issue. Back in September 2013, Mattox filed a motion for leave to file a (corrected) proposed amended complaint. (*See* Dkts. 37, 38.) In addressing that motion, the magistrate judge stated that the sufficiency of the allegations against Dr. Edelman would be better addressed following this Court's resolution of Dr. Edelman's summary-judgment motion. (Dkt. 65, Aug. 6, 2014 Order at 12.) The Court has reviewed the allegations in the corrected proposed amended complaint (Dkt. 38) and those in a very recently filed proposed complaint (*see* Dkts. 73, 74).[4] Nothing in those proposed pleadings alters this Court's analysis of Dr. Edelman's culpability. The only new information appears to be a letter that Mattox sent to Dr. Edelman on September 20, 2011, apparently the second such letter, recounting Dr. Edelman's authorization refusals and pleading with Dr. Edelman to reconsider his decisions. (Dkt. 74, Proposed Am. Compl. Ex 11-B.) This new fact does not

---

[4] Despite that the magistrate judge advised Mattox not to file another motion to amend until this Court had opportunity to address Dr. Edelman's summary-judgment motion and his recommendation to grant the motion (Aug. 6, 2014 Order at 17), Mattox nonetheless filed another proposed amended complaint.

permit a jury to find deliberate indifference insomuch as the letter did not provide Dr. Edelman

with new information that would have warranted him revisiting his initial decisions. (*See id.*)

## IV.

For the foregoing reasons, the Court OVERRULES Mattox's objections (Dkt. 66) and

ADOPTS IN PART the Report and Recommendation (Dkt. 62). The Court adopts the Report and

Recommendation except for (1) the first full paragraph on page 41 that begins with the sentence,

"Furthermore, to the extent plaintiff claims the cardiac catheterization or the prescription for

Renexa was delayed, the Sixth Circuit has explained, . . . .," (2) Part II.D.5.b, and (3) Part

II.D.5.d. It follows that Dr. Edelman's motion for summary judgment (Dkt. 44) is GRANTED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2014

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the
attorneys and/or parties of record by electronic means or U.S. Mail on September 29,
2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson